### NEC ELECTRONICS, Plaintiff/Counter-Defendant/Appellee,

v.

### CAL CIRCUIT ABCO, Alex Sandel, Jason Barzilay, Benny Alagem, Defendant/Counter-Claimant/Appellant.

### NEC ELECTRONICS, INC., Plaintiff/Counter-Defendant/Appellee,

v.

### Alex SANDEL, Jason Barzilay, Benny Alagem, Maury Friedman, Defendant,

### NEC Corporation and NEC Electronics, Inc., Counter-Defendant,

and

### CAL Circuit Abco, Inc., aka CAL-Abco, Defendant/Counter-Claimant/Appellant.

Nos. 86-6300, 86-6456.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 1, 1986.

Decided Feb. 24, 1987.

Stephen L. Hock, San Francisco, Cal., for plaintiff/counter-defendant/appellee.

Thomas J. McDermott, Jr., Los Angeles, Cal., for defendants/counter-claimants/appellants.

Before WALLACE, SNEED and SCHROEDER, Circuit Judges.

SNEED, Circuit Judge:

A Japanese manufacturer of computer chips, NEC Corporation (NEC–Japan), assigned its United States trademark rights to its California subsidiary, NEC Electronics (NEC–USA). Defendant, CAL Circuit Abco (Abco), engages in "parallel importation" of NEC–Japan's chips: it buys them abroad at the lower prices there prevalent, and then imports and sells them here. NEC–USA sued for trademark infringement under the Lanham Act. On pre-trial motions, the district court held for plaintiff and enjoined defendant from selling any more of the foreign-purchased chips. We denied defendant's emergency motion for a stay, but we granted expedited appeal and now reverse.

I.

*FACTS*

NEC–Japan is one of the world's largest manufacturers of computer chips, reporting sales of nearly $2 billion dollars in 1985. NEC–USA is a wholly-owned subsidiary whose control remains primarily vested in the parent; NEC–Japan directors constitute a majority of NEC–USA's board of directors. NEC–USA manufactures some computer chips at its own facilities in the United States, but imports ninety percent of the NEC chips it sells from the parent company.

In 1983, NEC–Japan, owner of the trademark "NEC" in this country and elsewhere, assigned all rights to the mark in the United States to NEC–USA, and duly registered this assignment with the federal Patent and Trademark Office. NEC–Japan continues to market its computer chips outside the United States, evidently at prices substantially lower than those charged here by NEC–USA. Defendant Abco buys these so-called "grey market" chips from a

foreign source, imports them, and sells them here in direct competition with NEC–USA. The parties have stipulated that Abco's chips are genuine NEC products.

NEC–USA sued Abco for trademark infringement under sections 32 and 43 of Lanham Act, 15 U.S.C. §§ 1114, 1125.[1] NEC–USA alleges that Abco's use of the "NEC" trademark confuses consumers who believe that Abco's sales are authorized by or connected to NEC–USA. The evidence indicates, and the district court found, that some purchasers from Abco mistakenly thought their chips were protected by NEC–USA's servicing and warranties. Based on consumer confusion of this sort, the court granted NEC–USA's motions for partial summary judgment and for a preliminary injunction. Abco appeals both orders.

## II.

### JURISDICTION AND STANDARD OF REVIEW

The district court certified its grant of partial summary judgment for immediate appeal, and we accepted jurisdiction under 28 U.S.C. § 1292(b). We have jurisdiction

to review the issuance of a preliminary injunction under 28 U.S.C. § 1292(a)(1).

Our review of summary judgments is de novo. Our review of preliminary injunctions is more deferential: we will uphold the order unless the lower court applied incorrect law, relied on clearly erroneous factual findings, or otherwise abused its discretion. *United States v. Akers*, 785 F.2d 814, 817–18 (9th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986).

## III.

### ANALYSIS

Section 32 of the Lanham Act provides the registered owner of a trademark with an action against anyone who without his consent uses a "reproduction, counterfeit, copy, or colorable imitation" of the mark in such a way as "is likely to cause confusion, or to cause mistake, or to deceive." [2] Similarly, section 43(a) provides for civil liability if goods are marketed bearing "a false designation of origin." [3] The issue before us is whether a United States subsidiary that sells certain goods in this country can

---

1. In its complaint NEC–USA included several state law claims as well. Abco counterclaimed under federal antitrust law and various state laws, adding NEC–Japan as counter-defendant. NEC–USA moved for partial summary judgment on its Lanham Act claims and for a preliminary injunction. The district court considered these motions together, and only they are before this court on appeal.

2. Any person who shall, without the consent of the registrant—
   (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
   (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or ad-

vertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.
   shall be liable in a civil action by the registrant for the remedies hereinafter provided. 15 U.S.C. § 1114(1).

3. Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation. 15 U.S.C. § 1125(a).

sue under these provisions if another company, such as Abco, buys the parent's identical goods abroad and then sells them here using the parent's true mark. We think not.

■ Trademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent. *See Monte Carlo Shirt, Inc. v. Daewoo Int'l (Am.) Corp.,* 707 F.2d 1054, 1057–58 & n. 3 (9th Cir.1983); *Diamond Supply Co. v. Prudential Paper Prods. Co.,* 589 F.Supp. 470, 475 (S.D.N.Y.1984). Once a trademark owner sells his product, the buyer ordinarily may resell the product under the original mark without incurring any trademark law liability. *See Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368–69, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924). The reason is that trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold. *See Prestonettes,* 264 U.S. at 368–69, 44 S.Ct. at 351; *Monte Carlo* 707 F.2d at 1058. These principles, without more, would control this case were it not for the Supreme Court's decision in *A. Bourjois & Co. v. Katzel,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923).

*Katzel* involved cosmetics that, like NEC computer chips, were manufactured overseas, purchased abroad, and sold here under the manufacturer's trademark without the consent of a United States company which had obtained the American trademark rights and which also imported the goods into this country. The Second Circuit had held, following prior case law, that plaintiff had no claim for trademark infringement because the goods were genuine. *See* 275 F. 539, 540 (2d Cir.1921). The Supreme Court reversed. NEC–USA argues that *Katzel* controls our decision here.

We disagree. Parsing Justice Holmes's characteristically laconic opinion, we discern two rationales for the holding in *Katzel.* First, the American company that acquired the mark had made an arm's-length contract with the manufacturer—it had paid "a large sum" for the trademarks and the goodwill associated with them, 260 U.S. at 690, 43 S.Ct. at 245—which was clearly intended to prohibit the manufacturer from selling its goods directly in this country. "After the sale the French manufacturers could not have come to the United States and have used their old marks in competition with the plaintiff." *Id.* at 691, 43 S.Ct. at 245. The Court was not prepared to permit the manufacturer to "evade" this restriction by selling to middlemen abroad for sale in the United States, thus to deprive the American mark owner of the entire benefit of its bargain. *Id.* at 691–92, 43 S.Ct. at 245.

Second, because the manufacturer had forgone all its rights to its trademark in this country, the American owner of that mark now had complete control over and responsibility for the quality of goods sold under that mark. *See id.* at 692, 43 S.Ct. at 245. Plaintiff American owner might have chosen to sell a different product under the assigned mark; the foreign producer might have begun selling an inferior product abroad. With respect to sales in this country, plaintiff had become the true source of the trademarked goods, and the value of plaintiff's trademark could have been entirely destroyed by the importation of foreign-purchased goods whose quality and contents were beyond its control. It was thus "not accurate" to say that a parallel importer's use of the mark would "truly indicate[ ] the origin of the goods." *Id.*

Both these rationales presuppose the American owner's real independence from the foreign manufacturer, and courts interpreting *Katzel* have repeatedly emphasized this factor. The Supreme Court itself has characterized *Katzel* as a case in which the defendant distributor sought to market goods "of one make under the trade mark of another." *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 128, 67 S.Ct. 1136, 1138, 91 L.Ed. 1386 (1947). This court has noted that *Katzel* "did not involve the plaintiff's 'genuine' goods but rather goods produced by the owner of

plaintiff's trademark in a foreign country," and that in *Katzel* "the plaintiff could [have] suffer[ed] from inability to control the quality of the foreign producer's goods." *Monte Carlo*, 707 F.2d at 1057 n. 3.

Finally, the Second Circuit, in a recent grey-marketeering case where the American mark holder was (like NEC–USA) a subsidiary of the foreign manufacturer, noted that the plaintiff in *Katzel* was "an independent domestic trademark owner [which had] purchased the U.S. trademark rights," and limited *Katzel* to its "special facts." *Olympus Corp. v. United States*, 792 F.2d 315, 321–22 (2d Cir.), *petition for cert. filed*, 55 U.S.L.W. 3372 (U.S. Nov. 6, 1986) (No. 86–757). That is, the *Olympus* court concluded that section 42 of the Lanham Act, 15 U.S.C. § 1124, barring importation of goods that "copy or simulate" a trademark, did not apply to genuine goods except in cases presenting the same "equities" as *Katzel*. *Id.* We think this conclusion correct for sections 32 and 43 of the Lanham Act as well. Where the American trademark owner is a wholly-owned and controlled subsidiary of the foreign manufacturer, neither of the *Katzel* rationales applies.

Under these circumstances, NEC–Japan would not be "evading" any terms of its trademark assignment to NEC–USA by selling its computer chips to American distributors abroad. NEC–USA is not losing any benefits for which it bargained and which it might have legitimately expected NEC–Japan not to circumvent. In fact, NEC–Japan may at any time begin marketing its products here on its own, simply by causing NEC–USA to consent to such marketing or to return the trademark rights to the parent. Moreover, because NEC–Japan and NEC–USA are commonly controlled, there is no danger to the latter in being unable to control the quality of the former's products. In this situation, we cannot say that Abco is selling goods "of one make under the trade mark of another." *See Champion Spark Plug*, 331 U.S. at 128, 67 S.Ct. at 1138. Nor is it inaccurate to say that the mark "NEC" on Abco's products truly designates the chips as having been manufactured under the control of NEC–Japan, even if the mark has become associated here with NEC–USA. If, as NEC–USA alleges, Abco sales agents mislead their buyers about the availability of NEC–USA servicing, then Abco may be liable in contract or tort, but not in trademark.[4]

---

4. NEC–USA may also have a claim under the Tariff Act. After the Second Circuit issued its opinion in *Katzel,* but before the Supreme Court reversed it, Congress responded by passing section 526 of the Tariff Act, directing Customs to bar importation of goods bearing a trademark identical to a United States mark without the American mark owner's consent. *See* 19 U.S.C. § 1526(a), (b). The section provides for private actions by the American trademark owner as well. *See* 19 U.S.C. § 1526(c); *Olympus,* 792 F.2d at 320; *Perry v. American Hecolite Denture Corp.,* 78 F.2d 556, 559 (8th Cir.1935) (mark owner may sue parallel importer under this section for injunction and damages).

Our conclusion today, however, is reinforced by the fact that the Customs Service has for decades made an exception to section 526 in cases where the American trademark owner and the foreign producer are under common control. Customs regulations expressly include the parent/subsidiary relationship as one of common control. *See* 19 C.F.R. § 133.21(c)(2) (1986). Because of the recent expansion in grey-marketeering, these regulations have lately

been challenged in several courts. The results are mixed. *Compare Olympus* (upholding the regulations) *and Vivitar Corp. v. United States,* 761 F.2d 1552 (Fed.Cir.1985) (five-judge panel) (same), *cert. denied,* — U.S. —, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986), *with Coalition to Preserve the Integrity of Am. Trademarks v. United States,* 790 F.2d 903 (D.C.Cir.) *("COPIAT")* (invalidating the regulations), *cert. granted,* — U.S. —, 107 S.Ct. 642, 93 L.Ed.2d 699 (1986). This court has not yet ruled on the matter. *See United States v. Eighty-Nine (89) Bottles of "Eau de Joy,"* 797 F.2d 767, 770 n. 2 (9th Cir.1986).

If in *COPIAT,* the Supreme Court upholds the challenged regulations, then our holding today will be consistent: foreign producers will not be able to accomplish under trademark law what they cannot do under the Tariff Act. But even if the Court invalidates the regulations, our decision is still not inconsistent: we will simply have obliged plaintiff to proceed with its remedies under the Tariff Act, which, whatever their limits, Congress provided precisely in order to add to—not to replicate—the protections available under trademark law.

If NEC–Japan chooses to sell abroad at lower prices than those it could obtain for the identical product here, that is its business. In doing so, however, it cannot look to United States trademark law to insulate the American market or to vitiate the effects of international trade. This country's trademark law does not offer NEC–Japan a vehicle for establishing a worldwide discriminatory pricing scheme simply through the expedient of setting up an American subsidiary with nominal title to its mark.

The grant of partial summary judgment is REVERSED, the preliminary injunction VACATED, and the case REMANDED for further proceedings on the remaining claims.