**YAMAHA CORPORATION OF AMERICA, Appellant,**

v.

**UNITED STATES of America, et al.**

**No. 90-5318.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 28, 1992.

Decided April 14, 1992.

Rehearing Denied July 16, 1992.

Robert E. Wagner, with whom Linda A. Kuczma and James J. Jagoda, Chicago, Ill., were on the brief, for appellant. William T. Bullinger, Washington, D.C., also entered an appearance for appellant.

Daniel J. Standish, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellees.

Before WALD, SENTELLE, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellant Yamaha Corporation of America ("Yamaha–America") appeals from two orders of the district court dismissing its complaint against appellees the United States of America, the Secretary of the Treasury ("Secretary"), and the Commissioner of Customs. Appellant challenged the legality of certain regulations of the United States Customs Service ("Customs") that permit Customs to deny a "genuine goods" exclusion order to the holder of a U.S. trademark that is also a wholly owned subsidiary of the foreign-trademark holder. The district court concluded that appellant was precluded from relitigating the issue that the regulations are invalid under the Tariff Act of 1930, 19 U.S.C. §§ 1202–1677k (1988) ("Tariff Act"),

and under the Trademark Act of 1946, 15 U.S.C. §§ 1051–1127 (1988) ("Lanham Act"), because these identical issues had already been litigated and resolved by the district court of the Central District of California in a different case. The district court below also dismissed appellant's claims that its rights under certain treaties guaranteeing non-discriminatory "national treatment" to foreign corporations had been violated.

Because we conclude that the district court properly determined that the doctrine of issue preclusion prevents appellant from relitigating its claims under the Tariff and Lanham Acts and that appellant has no cause of action under the treaties, we affirm.

## I.  BACKGROUND

Yamaha–America is a California corporation. It is a wholly owned subsidiary of Yamaha Corporation, a Japanese company ("Yamaha–Japan"). Since 1960, Yamaha–America has been the exclusive authorized U.S. distributor of "Yamaha" brand music and sound equipment products manufactured by Yamaha–Japan. Yamaha–America is the registered owner by assignment from Yamaha–Japan of 18 separate U.S. trademarks.

Yamaha–America claims to have been unlawfully injured by so-called "gray-market," or parallel, imports. Gray-market goods are foreign-manufactured products bearing a valid U.S. trademark that are imported without the consent of the American trademark holder.[1] Gray-market goods are distinguished from counterfeit goods in that the use of the United States trademark is authorized by the holder of the foreign trademark.

A.  *The* ABC *Litigation*

In December 1986, Yamaha–America filed an action in the Central District of California seeking damages and injunctive relief against ABC International Traders Corporation ("ABC"), for trademark infringement and unfair competition under the Lanham Act and the laws of California. ABC is a corporation engaged in the importation, distribution, sale, and warranty of various goods including genuine Yamaha brand electronic sound equipment.[2] In November 1987, Yamaha amended its complaint to include claims under section 526 of the Tariff Act, 19 U.S.C. § 1526 (1988) ("section 526"), and section 42 of the Lanham Act, 15 U.S.C. § 1124 (1988) ("section 42"). In its five-count amended complaint, Yamaha–America alleged the following:

Count I—ABC has violated section 32(a) of the Lanham Act, 15 U.S.C. § 1114(a) (1988), by advertising and selling products made by Yamaha–Japan and bearing marks identical to marks owned by Yamaha–America in such a way that their use is likely to cause customer confusion or mistake and to deceive the public.

Count II—ABC has violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), by falsely representing or creating the impression that Yamaha–America is associated or affiliated with ABC and that it warrants the quality or guarantees repair of such products.

Count III—ABC has violated California law by intentionally promoting its products so as to confuse and deceive and unlawfully to exploit and appropriate the valuable property rights and good will of Yamaha–America.

Count IV—ABC has violated California law by using Yamaha–America's

---

1.  Gray-market imports typically increase during periods when the dollar is strong relative to other currencies. The goods are generally bought overseas by discounters, who then import and market the products in the United States at reduced prices relative to the authorized domestic retailer. *See* Comment, *Applying Grecian Formula to International Trade:* K Mart Corp. v. Cartier, Inc. *and the Legality of Gray Market Imports*, 74 VA.L.REV. 1397, 1398 (1989).

2.  "Genuine" goods are goods that are in fact manufactured by the same manufacturer that supplies the U.S. trademark holder. In other words, they are to be distinguished from goods that "copy or simulate" the genuine article; they *are* the genuine article, although they may not have been intended for distribution in the U.S. market. *See Lever Bros. Co. v. United States,* 877 F.2d 101, 105 (D.C.Cir.1989).

marks without authorization in such a way that it is likely to injure Yamaha–America's reputation and to dilute the distinctiveness of Yamaha–America's trademarks.

Count V—ABC has violated section 526 of the Tariff Act and section 42 of the Lanham Act by unlawfully importing and dealing in goods bearing the trademarks owned by Yamaha–America without its consent.

ABC counterclaimed against both Yamaha–America and Yamaha–Japan, alleging violations of the Clayton Act, 15 U.S.C. § 13 (1988), the Wilson Tariff Act, 15 U.S.C. § 8 (1988), and the Sherman Act, 15 U.S.C. §§ 1–2 (1988). ABC also alleged violations of California law, including interference with business relations, defamation, and unfair competition.

### 1. The District Court's Decision

On November 9, 1987, Judge Lew of the Central District of California granted ABC's motion for partial summary judgment as to Counts I and II. He made the following conclusions of law:

4. There is and can be no likelihood of confusion, or confusion as to source, origin or sponsorship, between [Yamaha–Japan]-manufactured goods sold by [Yamaha–America] and [Yamaha–Japan]-manufactured goods sold by ABC, which bear trademarks identical to the assigned trademarks.

5. As a matter of law there is and can be no violation of Lanham Act Sections 32 or 43(a) by ABC ... by virtue of the acts of ABC in importing and selling "YAMAHA" brand goods manufactured by [Yamaha–Japan].

Statement of Uncontroverted Facts and Conclusions of Law (dated Oct. 19, 1987) (citations omitted) (incorporated by reference in Judge Lew's oral ruling granting summary judgment as to Counts I and II (Nov. 9, 1987).

On December 23, 1988, Judge Lew granted ABC's motion for summary judgment as to the remaining counts of Yamaha–America's Amended Complaint. *See Yamaha Corp. of Am. v. ABC Int'l Traders Corp.,* 703 F.Supp. 1398 (C.D.Cal.1988), *aff'd in part, rev'd in part on other grounds,* 1991 WL 144474, 1991 U.S.App. LEXIS 17882 (9th Cir. July 30, 1991) [940 F.2d 1537 (table) ], *cert. denied,* —— U.S. ——, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992). As to Count III, Judge Lew concluded that Yamaha–America failed to sustain its burden of documenting a genuine issue of fact concerning customer confusion under California's unfair competition law. *Id.* at 1402. As to Count IV, Judge Lew concluded that no legally recognizable injury to reputation or dilution of the trademark "can possibly come to Yamaha–America if ABC limits its activities to the sale of genuine Yamaha products." *Id.*[3]

#### a. *Count V—Tariff Act*

It is Judge Lew's treatment of Count V that is most relevant to the question of issue preclusion in this case. Yamaha–America alleged in Count V that ABC's importation of genuine Yamaha products violated its rights under the Tariff Act and the Lanham Act. The relevant portion of section 526 of the Tariff Act provides that

it shall be unlawful to import in the United States any merchandise of foreign manufacture if such merchandise ... bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States ... unless written consent of the owner of such trademark is produced at the time of making entry.

19 U.S.C. § 1526(a) (1988). Judge Lew recognized that the protection provided by section 526 "has been consistently interpreted by U.S. Customs for more than fifty years not to be available to American subsidiaries

---

**3.** Judge Lew found that Yamaha failed to meet its burden of establishing a genuine issue of fact as to consumer confusion over the source and sponsorship of the goods or as to injury to Yamaha–America's reputation. With every genuine product it sells, ABC provides both its own warranty and a statement that the goods were

imported by ABC and not by Yamaha–America. *ABC,* 703 F.Supp. at 1402 ("While the goods are made by Yamaha–Japan, the services provided with those goods are ABC's and thus any fallout from the lack of quality of those services reflects poorly upon ABC and not Yamaha.").

of foreign corporations." *ABC,* 703 F.Supp. at 1403.[4]  After quoting directly from 19 C.F.R. § 133.21(c)(2) (the "Regulation"), Judge Lew added that the Supreme Court had recently upheld the Regulation in *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), as a permissible interpretation of section 526. *ABC,* 703 F.Supp. at 1403.

Yamaha–America had argued to the *ABC* court that it had rights under section 526 to seek damages and an injunction against a private gray-market importer even if Customs would not have issued a genuine-goods exclusion order under the Regulation.  In other words, Yamaha–America had argued that the Regulation does not define the full scope of the protection provided by section 526; even if the Regulation is valid, ABC's actions violated Yamaha–America's rights under section 526. *See* Transcript of Oral Argument (D.C.Cir. filed Mar. 11, 1992) ("Transcript") at 31 (discussing argument made to *ABC* court and on appeal to Ninth Circuit). Judge Lew rejected Yamaha–America's argument, however, declining "to interpret § 526 any differently than does the Customs Service." *ABC,* 703 F.Supp. at 1403. He added that

> even if this Court were to review the statute *de novo,* it would conclude that Yamaha is not entitled to relief under § 526.  To allow Yamaha–America and firms like it such protection would allow any foreign manufacturer to use a wholly owned American subsidiary as a means to secure the help of American tariff law in enforcing worldwide price discrimination.  This can not be seen to

have been the intent of Congress in passing § 526.

*Id.* Judge Lew's grant of summary judgment to ABC on Yamaha–America's Tariff Act claim was clearly based on two reasons: First, the Regulation—which the Supreme Court recognized to be a reasonable interpretation of section 526—withholds the protections of section 526 from a U.S. trademark holder that is a subsidiary of the foreign trademark holder; and second, section 526 itself excludes from its general protected class those U.S. trademark holders that are wholly owned American subsidiaries of the foreign trademark holders.

### b. *Count V—Lanham Act*

Yamaha–America also claimed in Count V that its rights under section 42 of the Lanham Act were being violated by ABC's gray-market importation.  The relevant portion of section 42 provides that

> no article of imported merchandise ... which shall copy or simulate a trademark registered in accordance with the provisions of this chapter or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States ... shall be admitted to entry at any customhouse of the United States....

15 U.S.C. § 1124 (1988).  According to Judge Lew, however, Yamaha–America had already admitted that the goods imported by ABC were genuine Yamaha items.  Relying on *NEC Electronics v. CAL Circuit Abco,* 810 F.2d 1506 (9th Cir.), *cert. denied,* 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987), and *Olympus Corp. v. United States,* 792 F.2d 315 (2d Cir.1986), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033,

---

**4.** This is not technically true.  In 1936, Customs adopted a regulation exempting merchandise manufactured in a foreign country under a foreign trademark from section 526 coverage "if such foreign trade-mark or trade name and such United States trade-mark or trade name *are owned by the same person, partnership, association, or corporation.*"  T.D. 48,537, 70 Treas. Dec. 336, 337 (1936) (emphasis added).  In 1953, the regulations expanded that "same company" exception to include situations where the domestic trademark holder and the foreign trademark holder exercised legitimate control over one another with respect to the nature and

quality of the goods in question. *See* T.D. 53,-399, 88 Treas.Dec. 376, 384 (1953).  Finally, in 1972, Customs reissued the regulations in their current form, expanding the "same company" exception to encompass situations where the foreign and domestic trademark holders are "parent and subsidiary companies or are otherwise subject to common ownership or control." 19 C.F.R. § 133.21(c)(2) (1991). *See generally Vivitar Corp. v. United States,* 761 F.2d 1552, 1566–67 (Fed.Cir.1985) (recounting history of Customs's regulation), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986).

100 L.Ed.2d 618 (1988), Judge Lew concluded that "the importation of genuine goods is not actionable under the Lanham Act." *ABC*, 703 F.Supp. at 1404. Judge Lew interpreted *NEC Electronics* as holding that "no cause of action arose under the Lanham Act when an American importer imported *genuine* trademarked items that had been sold overseas by the parent of the American trademark holder." *Id.* (emphasis in original). Judge Lew found this interpretation of the Lanham Act to be a reasonable one because the decision to sell goods at a lower price abroad (thereby creating conditions for a gray market) is made by the same people who control the American subsidiary; allowing that subsidiary to claim a trademark violation would effectively provide the foreign company with a means of insulating the American economy from the effects of international competition. Accordingly, he granted summary judgment against Yamaha–America on its Lanham-Act claim.

Yamaha–America moved under Rule 54(b) of the Federal Rules of Civil Procedure for the entry of final judgment as to all claims for the purposes of expediting appeal. Judge Lew denied the motion, and Yamaha–America moved for reconsideration. In its memorandum in support of its motion for reconsideration, Yamaha–America argued that the goods imported by ABC were physically different from those imported by Yamaha–America and therefore did not legitimately fall under the genuine-goods exception to Lanham Act protection. In a one-page order, Judge Lew wrote:

> [H]aving read and considered the papers filed in support of and in opposition to the motion, the Court hereby removes the motion from the Court's law and motion calendar ... and issues the following order:
>
> Plaintiffs' motion for reconsideration is DENIED. IT IS SO ORDERED.

Order (filed Mar. 29, 1989).

### 2. The Ninth Circuit's Opinion

After ABC's counterclaims were later dismissed, both Yamaha–America and ABC appealed to the Ninth Circuit. In July 1991, the Court of Appeals affirmed the granting of summary judgment against Yamaha–America. *See Yamaha Corp. of Am. v. ABC Int'l Traders, Inc.*, Nos. 90–55036, –55120, 1991 WL 144474, 1991 U.S.App. LEXIS 17882 (9th Cir. July 30, 1991) [940 F.2d 1537 (table)] (9th Cir.1991) (*"Ninth Circuit Opinion"*). In an unpublished opinion, the court determined that, with respect to its Lanham Act claims, although Yamaha–America had belatedly attempted to distinguish *NEC Electronics* by suggesting that the products imported by ABC were physically different in material ways from those imported by Yamaha–America, this argument was untimely raised in the motion for reconsideration and proffered only in the form of a lawyer's affidavit. Judge Lew "did not err in granting summary judgment against Yamaha on the trademark claims." *Id.* 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *4.

With respect to Yamaha–America's Tariff Act claims, the Court of Appeals concluded that

> [t]he district court also correctly granted summary judgment in favor of ABC on Yamaha's claims under the Tariff Act, 19 U.S.C. § 526, which prohibits the importation of foreign made goods bearing a trademark owned by a United States corporation.... We affirm the district court's determination that the regulation leaves no room for Yamaha's Tariff Act claim.

*Id.*[5]

### B. *Procedural History of this Case*

On May 17, 1989 (almost five months *after* Judge Lew's decision in *ABC*), Yamaha–America filed suit against the United States, the Secretary, and the Commissioner of Customs. In its two-count complaint, Yamaha–America alleged the following:

> Count I—Yamaha–America is entitled to a declaratory judgment that Customs should issue an exclusion order prohibiting importation of genuine goods manufactured by Yamaha–Japan.
> Count II—Yamaha–America is entitled to a declaratory judgment that Customs

---

**5.** The Court of Appeals reversed Judge Lew's dismissal of ABC's antitrust counterclaims and remanded for further development of the record.

regulation 19 C.F.R. § 133.21(c)(2) is invalid for the following reasons:

(1) it exceeds the authority granted to the Secretary, for he has power to promulgate only those regulations consistent with law;

(2) it discriminates against Yamaha–America by denying it rights under the Lanham Act and the Tariff Act to which other domestic corporations are entitled, merely on the basis of its Japanese ownership;

(3) it deprives Yamaha–America of its constitutional rights to due process and equal protection by denying it the protections of the Tariff Act and the Lanham Act;

(4) it directly conflicts with Article 2 of the Paris Convention for the Protection of Industrial Property which provides that all members will accord to other member owners of trademarks the same rights as enjoyed by domestic citizens;

(5) it directly conflicts with Article X of the 1953 Treaty of Friendship, Commerce and Navigation between the United States and Japan, which provides for "national treatment" of corporations owned by the other party.

See Complaint (filed May 17, 1989) at 8–11.

### 1. Yamaha I

Appellees moved to dismiss the complaint, arguing that the doctrine of issue preclusion prevented Yamaha–America from relitigating claims under the Tariff and Lanham Acts it had previously raised and lost in *ABC.* The district court agreed:

The issues regarding the Lanham and Tariff Acts in the instant case are identical to those actually litigated and necessarily decided in *ABC International Traders.* Moreover, the issues here— whether the Lanham and Tariff Acts provide plaintiff a basis to block the goods manufactured by Yamaha Japan—were actually and necessarily determined in *ABC.*

*Yamaha Corp. of Am. v. United States,* 745 F.Supp. 730, 731–32 (D.D.C.1990) ("*Yamaha I*").

Although the district court concluded that Yamaha–America's arguments as to the validity of the Regulation under the Tariff and Lanham Acts must be dismissed, it concluded that the parties had not adequately briefed the matter of whether Yamaha–America was precluded from arguing that the gray-market goods in this case were "physically different" from the authorized goods and, therefore, fell into the exception recognized in *Lever Brothers Co. v. United States,* 877 F.2d 101 (D.C.Cir. 1989).[6] It therefore denied defendants' motion to dismiss as to the physical-differences argument.

Yamaha–America's claims under the Treaty of Friendship, Commerce and Navigation, Apr. 2, 1953, U.S.–Japan, 4 U.S.T. 2063 ("Treaty of Friendship"), and under the Paris Convention for the Protection of Industrial Property of March 20, 1883, *as revised* July 14, 1967, 21 U.S.T. 1583, 1629 ("Paris Convention"), were not addressed by the court in *ABC.*[7] Article X of the Treaty of Friendship provides that nationals and companies of either party shall be accorded "national treatment and most favored nation treatment with respect to obtaining and maintaining patents of invention and with respect to rights in trade

---

**6.** In *Lever Brothers,* we concluded that "the natural, virtually inevitable reading of § 42 is that it bars foreign goods bearing a trademark identical to a valid US trademark *but physically different,* regardless of the trademarks' genuine character abroad or affiliation between the producing firms." *Lever Bros.,* 877 F.2d at 111 (emphasis added). To the extent that the physical differences of the gray-market good are not readily detectable, there is a risk that consumers will be confused into thinking that the gray-market good and the authorized good are identical.

**7.** Yamaha–America did, in fact, raise the issue of its rights under both the Paris Convention and the Treaty of Friendship in its memorandum in support of its motion for reconsideration in *ABC.* However, appellees never argued to the district court below that these issues were also precluded, and they do not make that argument on appeal. *See* Transcript at 27. The district court ruled on the merits of Yamaha–America's treaty claims, and we review the decision on the merits as well.

marks...." *Id.* art. X, 4 U.S.T. at 2071.[8] The district court concluded, however, that Yamaha–America was neither a national nor a company of Japan and that it lacked standing, as an American company in the United States, to invoke the terms of Article X. *Yamaha I*, 745 F.Supp. at 733.

Article 2(1) of the Paris Convention extends to the nationals of all countries of the "Union"—of which both the United States and Japan are part—all the advantages pertaining to the protection of industrial property that each member of the Union extends to its own nationals.[9] Furthermore, Article 2(2) prohibits the establishment of domicile requirements.[10] The district court determined that, as in the case of the Treaty of Friendship, Yamaha–America was attempting to invoke a provision of a treaty intended to protect foreign nationals doing business in the United States. The district court dismissed Yamaha–America's claim under the Paris Convention for failure to state a claim upon which relief could be granted.

### 2. Yamaha II

Additional briefing was provided on whether Yamaha–America was precluded from raising its claim under section 42 that it was entitled to a *Lever Brothers* exception to the non-applicability of the Lanham Act to the importation of genuine goods. According to Yamaha–America, the gray-market products have the following physical differences: They lack the Underwriters Laboratory Approval and electromagnetic shielding required by the FCC; they have dual voltage switches and different plugs; they are not covered by the same warranties; and they do not include the same training and educational services as those provided by Yamaha–America. Yam-

aha–America argued that these physical differences between the gray-market and authorized products mean that Yamaha–America may avail itself of the protections provided by section 42 of the Lanham Act. *See Lever Bros.*, 877 F.2d at 111.

Appellees argued that Yamaha–America had made the identical argument to the *ABC* court and that Judge Lew had rejected it. The district court agreed: "The *ABC* court could not have denied Yamaha America's motion [for reconsideration] without rejecting the contention that it failed to consider Yamaha America's arguments concerning physical differences." *Yamaha Corp. of Am. v. United States*, 745 F.Supp. 734, 736 (D.D.C.1990) ("*Yamaha II*"). According to the district court, "*ABC* resolved the legal question of whether physical differences in gray market products place them within the umbrella of the federal trademark laws, and that is the issue Yamaha America is estopped from rearguing." *Id.* at 737. The fact that the district court might have reached a different conclusion on the merits under the law of this Circuit is irrelevant, for the doctrine of issue preclusion prevents reaching the merits, even where a different view would prevail. *Id.* at 738. Concluding that Yamaha–America's efforts to relitigate the relevance of physical differences "represents nothing more than garden variety forum shopping," *id.*, the district court dismissed the complaint and entered judgment against appellant.

### II. DISCUSSION

#### A. *Standard of Review*

■ In *Yamaha I*, the district court dismissed the majority of Yamaha–America's claims under Rule 12(b)(6) of the Federal

---

**8.** The Treaty of Friendship defines "companies" as follows: "Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party." Treaty of Friendship, art. XXII(3), 4 U.S.T. at 2080.

**9.** "Nationals of any country of the Union shall, as regards the protection of industrial property,

enjoy in all the other countries of the Union the advantages that their respective laws now grant, or may hereafter grant, to nationals...." Paris Convention, art. 2, 21 U.S.T. at 1631.

**10.** "[N]o requirement as to domicile or establishment in the country where protection is claimed may be imposed upon nationals of countries of the Union for the enjoyment of any industrial property rights." *Id.* art. 2(2).

Rules of Civil Procedure, and our review of that order is *de novo*. The same is true of the decision in *Yamaha II*, in which the district court disposed of the remaining claims under Rule 56. *Shields v. Eli Lilly & Co.*, 895 F.2d 1463, 1466 (D.C.Cir.1990) ("Since pretrial summary judgment decisions are rendered exclusively on the basis of a 'paper' record, an appellate court is equally well-positioned as a trial judge to assess the evidence at issue.").

## B. *Issue Preclusion*

The objective of the doctrine of issue preclusion (also known as collateral estoppel) is judicial finality; it fulfills "the purpose for which civil courts had been established, the conclusive resolution of disputes within their jurisdiction." *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 467 n. 6, 102 S.Ct. 1883, 1890 n. 6, 72 L.Ed.2d 262 (1982). The Supreme Court has defined issue preclusion to mean that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980).

■ The standards for establishing the preclusive effect of a prior holding are: First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case. *See McLaughlin v. Bradlee*, 803 F.2d 1197, 1201 (D.C.Cir. 1986); RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982) ("[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent

action between the parties").[11] Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination. An example of such unfairness would be when the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude. *See Otherson v. Department of Justice*, 711 F.2d 267, 273 (D.C.Cir.1983); *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979) (unfairness concern is heightened when plaintiff seeks to use collateral estoppel "offensively" against defendant when plaintiff was not party to prior suit); *Blonder–Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (fairness is implicated whenever there is risk that "prior proceedings were seriously defective").

■ In issue preclusion, it is the prior *judgment* that matters, not the court's opinion explicating the judgment. "Even in the absence of *any* opinion a judgment bars relitigation of an issue necessary to the judgment." *American Iron & Steel Inst. v. EPA*, 886 F.2d 390, 397 (D.C.Cir. 1989) (emphasis in original), *cert. denied*, —— U.S. ——, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990). Furthermore, once an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case. *See Securities Indus. Ass'n v. Board of Governors*, 900 F.2d 360, 364 (D.C.Cir.1990) (plaintiff may not raise new argument in second proceeding even though it was never made in first proceeding; so long as argument could have been made, it is precluded); RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c at 253 (if previously litigated "issue was one of law, new arguments may not be presented to obtain a different determination of that issue"). Preclusion cannot be avoided sim-

---

11. Although sections 27 (the rule itself) and 28 (exceptions to the rule) of the RESTATEMENT (SECOND) apply only where the second action is between the same persons who were parties to the first action, section 29 reads as follows:

A party precluded from relitigating an issue with an opposing party, in accordance with

§§ 27 and 28, is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify according him an opportunity to relitigate the issue.

RESTATEMENT (SECOND) OF JUDGMENTS § 29 (1982).

ply by offering evidence in the second proceeding that could have been admitted, but was not, in the first. CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4426 at 141 (1981).

### 1. Section 526

■ With respect to section 526 of the Tariff Act, Yamaha–America argues that the Regulation violates both due process and equal protection by denying it rights provided by the customs laws that are enjoyed by other domestic U.S. trademark holders. The district court concluded that Yamaha–America was precluded from litigating these issues. The court in *ABC* had held that Yamaha–America had no rights conferred upon it by section 526. The district court below reasoned that in light of this finding, "there can be no discrimination and no violation of equal protection or due process" involved in their denial. *Yamaha I,* 745 F.Supp. at 732 n. 6.

Yamaha–America argues that the validity of the Regulation was not an issue in *ABC;* indeed, its validity could not have been raised in a private action against a gray-market importer. "In fact, the *ABC* district court based it[s] grant of summary judgment against Yamaha America's § 526 claims on the Regulation. The *ABC* district court thereby simply assumed, without deciding, the Regulation's validity and applicability in denying Yamaha America's claim under the Tariff Act." Brief of Appellant (filed Dec. 18, 1991) ("Yamaha–America's Brief") at 12. This is, unfortunately for Yamaha–America's sake, not an accurate account of Judge Lew's decision. Judge Lew based his conclusion that Yamaha–America has no enforceable rights under section 526 on two separate and independent grounds: One was the Regulation, reflecting Customs's interpretation of section 526 that was held to be reasonable by the Supreme Court; the other, however, was the text of section 526 itself. *See ABC,* 703 F.Supp. at 1403. *See generally* JAMES WM. MOORE, JO DESHA LUCAS & THOMAS S. CURRIER, 1B MOORE'S FEDERAL PRACTICE ¶ 0.441[2] at 729 (1988) ("a judgment based alternatively upon two determinations, ei-

ther of which alone would be sufficient to sustain it, is an effective adjudication as to both grounds, and is collaterally conclusive as to both").

The issue that was litigated and necessarily determined by the court in *ABC* was whether or not Yamaha–America had any rights under section 526, inside or outside of the Regulation, that are violated by the gray-market importation of genuine Yamaha goods. It is precisely this issue that Yamaha–America now seeks to relitigate in this case. The district court was correct in concluding that Yamaha–America was precluded from doing so.

Yamaha–America now argues, however, that even if Judge Lew based his ruling that Yamaha–America had no rights under section 526 on grounds other than the Regulation, the unpublished Ninth Circuit opinion affirming *ABC,* which was released over ten months after *Yamaha II,* relied exclusively on the Regulation. *See* Yamaha–America's Brief at 12–13. Yamaha–America relies on *Stebbins v. Keystone Insurance Co.,* 481 F.2d 501, 507 n. 13 (D.C.Cir.1973) (Leventhal, J.), and *Martin v. Henley,* 452 F.2d 295, 300 (9th Cir.1971), for the proposition that when an appellate court affirms on only one of several grounds that served as alternative bases for the lower court decision, collateral estoppel attaches only to the issue expressly considered by the appellate court. *See also* MOORE, LUCAS & CURRIER, *supra,* ¶ 0.443[5.—2] at 790 n. 2 ("Where a case is decided alternatively by a trial court on several issues, but is disposed of on appeal on only one of these issues, only the issue considered by the appellate court is concluded.") (citing both *Stebbins* and *Martin* ). While it is clear that the district court below properly relied on the *ABC* judgment, *Southern Pac. Communications Co. v. American Tel. & Tel. Co.,* 740 F.2d 1011, 1018 (D.C.Cir.1984) ("collateral estoppel may be applied to a trial court finding even while the judgment is pending on appeal"), in reviewing its orders, we must take into consideration the effect of the intervening *Ninth Circuit Opinion* on the matter of issue preclusion.

Yamaha–America argued on appeal to the Ninth Circuit that section 526 gave it certain rights to pursue remedies against a gray-market importer that were· independent of Customs'. Regulation. *See, e.g., Olympus Corp. v. United ,States,* 792 F.2d 315, 320 (2d Cir.1986) ("Customs' interpretation of the statute does not limit the reach of protection of section 526; it only limits Customs' obligations to enforce the section by excluding goods."), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *Vivitar Corp. v. United States,* 761 F.2d 1552, 1568–70 (Fed.Cir.1985) (rejecting argument that section 526 must be interpreted as limited by Regulation), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986). The Ninth Circuit Court of Appeals concluded, however, that the district court "correctly granted summary judgment in favor of ABC on Yamaha's claims under the Tariff Act." *Ninth Circuit Opinion,* 1991 WL 144474, at *2, 1991 U.S.App. LEXIS 17882, at *4. In order to reach this conclusion, the Court of Appeals must necessarily, albeit implicitly, have rejected Yamaha–America's explicit argument that it had private rights under section 526 to exclude the gray-market goods that were greater than those encompassed by the Regulation.

The Court of Appeals did, of course, prominently mention that the Regulation, which was promulgated pursuant to section 526, states that the prohibitions against the importation of gray-market goods do not apply when the domestic trademark owner is a subsidiary of the foreign manufacturer. But notwithstanding Yamaha–America's arguments to the contrary, the appellate decision went further: The Court of Appeals explicitly affirmed the "district court's determination that the regulation leaves no room for Yamaha's Tariff Act claim." *Id.* In other words, Yamaha–America's claim that, despite the Regulation, it has independent rights under section 526 to exclude gray-market goods manufactured under Yamaha–Japan's trademark was actually and necessarily rejected by the Ninth Circuit.

Yamaha–America's allegations in this case that the Regulation is invalid because it violates the due process and equal protection rights of an American subsidiary of a foreign parent must be predicated on the assumption that Yamaha–America has some basic rights under section 526 that are being unfairly denied or discriminatorily withheld. But since the *ABC* courts have already determined that Yamaha–America has no rights under section 526 to bar the importation of the gray-market goods in this case, it is precluded from challenging the validity of the Regulation on the grounds that it violates any such rights.[12]

2. Section 42

Yamaha–America raises the same claims under the Lanham Act that it raises under the Tariff Act: namely, that the Regulation unconstitutionally deprives it of certain rights under the statute. Judge Lew in *ABC* concluded that section 42 does not protect Yamaha–America from the importation of goods manufactured by Yamaha-Japan. *ABC,* 703 F.Supp. at 1404. Furthermore, Judge Lew resolved the additional question of whether physical differences in these gray-market products "place them within the umbrella of the federal trademark laws" when he denied Yamaha–America's motion for reconsideration. *Yamaha II,* 745 F.Supp. at 737.

In *Yamaha II,* the district court below concluded that Yamaha–America was precluded from pursuing its "physical differences" argument in the D.C. forum because the *ABC* court rejected this argument in denying the motion for reconsideration. *Id.* at 736. At the time of its ruling, however, our district court did not have the benefit of the *Ninth Circuit Opinion.*

12. We agree that this case is not entirely controlled by *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). In *K Mart,* the issue was whether the Regulation was a reasonable agency interpretation of certain ambiguous phrases contained in section 526. Although the Court concluded that the Regulation was "valid," it did not address the scope of a U.S. trademark holder's rights under section 526, nor did it consider any constitutional challenges to the Regulation.

We, of course, must look to that ruling to ascertain the scope of issue preclusion.

The Ninth Circuit's opinion with respect to section 42 was straightforward: "Under *NEC*, there can be no successful trademark claim here, where the 'Yamaha' mark appearing on goods distributed by ABC was affixed by Yamaha–Japan, the manufacturer from whom ABC acquired the goods." *Ninth Circuit Opinion*, 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *2. With respect to the "physical-differences" argument, the Ninth Circuit stated only that Yamaha–America "failed to preserve this issue on appeal ... by not timely raising it in response to ABC's summary judgment motion." *Id.* 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *3.

■ The Ninth Circuit did not rule on the merits of the "physical-differences" argument. Therefore, Judge Lew's implicit rejection of that argument in denying the motion for reconsideration no longer precludes a second suit on the merits because although the Court of Appeals affirmed the *ABC* court, it did so solely on the grounds of procedural insufficiency. *See* MOORE, LUCAS & CURRIER, *supra*, ¶ 0.416[2] at 519 (trial court's dismissal of a complaint on both procedural grounds and on the merits will not preclude second suit on the merits if appellate court affirms only on the procedural ground). However, Yamaha–America may nonetheless be precluded from pursuing its Lanham Act claims if the evidence of "physical differences" could have been submitted in the *ABC* case but, for whatever reason, was never properly presented.

In *Jones v. United States*, 466 F.2d 131 (10th Cir.1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 257 (1973), the court considered whether a previous judgment that certain payments from an insurance agency to the taxpayers constituted "ordinary income" rather than "capital gains" would have preclusive effect on a second suit as to different tax years. The taxpayers sought to introduce evidence in the second trial that would "be submitted in admissible fashion ... so as to present more clearly the issues to be determined and allow them to be more fully litigated,

thus creating the distinct possibility of a different verdict." *Id.* at 136. The taxpayers argued that this "new" evidence would show that the payments received were actually deferred payments on the total purchase price of the insurance agency they had sold and were, therefore, taxable as long-term capital gains rather than as ordinary income. The court determined that the taxpayers were precluded from litigating their second suit, despite their intention to introduce evidence that was not presented in the prior trial:

> Evidence of this type is not the result of a different factual situation or changed circumstances. It is, instead, historical in nature and could have been admitted at the first trial if properly submitted. If the taxpayers' case was not effectively presented at the first trial it was their fault; affording them a second opportunity in which to litigate the matter, with the benefit of hindsight, would contravene the very principles upon which collateral estoppel is based and should not be allowed.

*Id.*

The evidence of "physical differences" between the gray-market and authorized goods was, according to the Ninth Circuit, only raised in Yamaha–America's motion for reconsideration. "There was no need for the district court to consider Yamaha's proffered evidence at the time of the reconsideration motion, particularly given that Yamaha sought to introduce it in the form of a lawyer affidavit." *Ninth Circuit Opinion*, 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *3. Yamaha–America seeks to introduce the evidence of "physical differences" in this case to support its argument that section 42 of the Lanham Act protects it from the gray-market importation of these goods. But this evidence could have been submitted to the district court in *ABC*. The doctrine of issue preclusion prohibits the relitigation of an issue actually determined and necessary to the judgment.

> A new contention is not ... necessarily a new issue. If a new legal theory or factual assertion put forward in the sec-

ond action is related to the subject-matter and relevant to the issues that were litigated and adjudicated previously, so that it *could* have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged.

MOORE, LUCAS & CURRIER, *supra,* ¶ 0.443[2] at 760–61 (internal quotation marks omitted) (emphasis in original).

In the *ABC* case, the issue of Yamaha–America's rights under section 42 was actually and necessarily determined. The Court of Appeals noted that, under Ninth Circuit precedent, "federal trademark law affords no protection for a wholly owned United States subsidiary of a foreign manufacturer against a rival company that imports and sells goods made by the foreign parent company." *Ninth Circuit Opinion,* 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *2. Yamaha–America failed properly to introduce evidence of "physical differences" in the *ABC* litigation, and it is precluded from relitigating the issue of its rights under section 42 based on this "new" evidence.

■ This is so despite the fact that this Circuit has arguably interpreted section 42 differently from the Ninth Circuit to permit its application to physically-different goods. *See Lever Bros.,* 877 F.2d at 111 ("On its face [section 42] appears to aim at deceit and consumer confusion; when identical trademarks have acquired different meanings in different countries, one who imports the foreign version to sell it under that trademark will (in the absence of some specially differentiating feature) cause the confusion Congress sought to avoid."). As the district court correctly recognized in *Yamaha II,* however, the fact that the substantive law may be different in the two jurisdictions does not affect the application of issue preclusion. "The doctrine of issue preclusion counsels us against reaching the merits in this case, ... regardless of whether we would reject or accept our sister circuit's position." *National Post Office Mail Handlers v. American Postal Workers Union,* 907 F.2d 190, 194 (D.C.Cir.1990); *Yamaha II,* 745 F.Supp. at 737–38.

## C. *International Treaties*

■ Yamaha–America's claims under Article X of the Treaty of Friendship and Article 2 of the Paris Convention are based on a common assumption: that in permitting the importation of gray-market goods, appellees are unlawfully discriminating against Yamaha–America because it is owned by a foreign corporation. Yamaha–America readily concedes that it is *not,* itself, a foreign corporation and that it is not invoking either treaty as a foreign corporation. Yamaha–America's Brief at 19. Instead, Yamaha–America argues that the Regulation violates the treaties by treating it differently from other domestic companies. As the Supreme Court has stated, "national treatment" means that local subsidiaries of foreign corporations "are considered for the purposes of the Treaty [of Friendship] to be companies of the country in which they are incorporated; they are entitled to the rights, and subject to the responsibilities of other domestic corporations." *Sumitomo Shoji Am., Inc. v. Avagliano,* 457 U.S. 176, 188, 102 S.Ct. 2374, 2381, 72 L.Ed.2d 765 (1982).

The crucial question for purposes of both the Treaty of Friendship and the Paris Convention is whether appellees have treated Yamaha–America differently under the Regulation solely because it is a wholly owned subsidiary of a foreign corporation. We think not. The Regulation would apply equally to the counterpart of Yamaha–America, *i.e.,* a domestic, wholly owned subsidiary of an American corporation which produces goods abroad both for sale and for import into the United States. The Supreme Court itself has recognized just such a variation on the typical gray-market situation:

Two other variations on this theme occur when an American-based firm establishes abroad a manufacturing subsidiary corporation (case 2b) or its own unincorporated manufacturing division (case 2c) to produce its United States trademarked goods, and then imports them for domestic distribution. If the trademark holder or its foreign subsidiary sells the trademarked goods abroad, the parallel impor-

tation of the goods competes on the gray market with the holder's domestic sales. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 286–87, 108 S.Ct. 1811, 1815, 100 L.Ed.2d 313 (1988).[13] The only relevant fact for the purposes of the Regulation is that the domestic trademark owner is subject to common ownership or control with the company which authorizes the distribution of the gray-market goods abroad.[14]

Yamaha–America has no cause of action under either the Treaty of Friendship or the Paris Convention to challenge the Regulation for discriminatory treatment. There is no violation of either treaty when Yamaha–America is treated like every other domestic trademark owner that shares common ownership or control with the owner of the foreign trademark.

## D. *Remaining Issues*

Yamaha–America has raised two additional issues: First, that appellees have violated the Fifth Amendment by taking its property rights without just compensation; second, that the Secretary exceeded his authority by promulgating a Regulation that is not consistent with law in violation of 19 U.S.C. § 66.[15]

### 1. The "Takings" Claim

■ Yamaha–America argues that Customs's refusal to grant a genuine goods

exclusion order, thereby permitting gray marketers to bring genuine "Yamaha" brand goods into the U.S. market, constitutes a "taking" without just compensation in violation of the Fifth Amendment. Yamaha–America's Brief at 13–14 & n. 11. Appellees respond to this argument by asserting that "Yamaha America's cryptic 'taking' argument appears to assume that the trademark laws give it rights that *ABC* determined it did not have." Brief for Appellees (filed Jan. 15, 1992) at 23 n. 12 (citation omitted). The property rights that presumably have been "taken" without just compensation are Yamaha–America's rights to be the sole distributor of "Yamaha" brand products in the United States. But if Yamaha–America is undersold by the gray market, it is because its own parent has chosen to sell the same goods abroad at a lower cost. It is true that the decision not to issue a genuine goods exclusion order has an impact on Yamaha–America's ability completely to control the market, but *ABC* determined that Yamaha–America has no right to such control. Yamaha–America is precluded from rearguing this same issue in the guise of a takings claim.[16]

### 2. Consistency with Law

■ Finally, Yamaha–America argues that the decision in *ABC* nowhere ad-

---

**13.** The Supreme Court held that the Regulation as applied to the two variations described in the text was a permissible construction of the ambiguous "merchandise of foreign manufacture" language contained in section 526 of the Tariff Act. *K Mart Corp.*, 486 U.S. at 292, 108 S.Ct. at 1818.

**14.** Yamaha–America's reliance on *Model Rectifier Corp. v. Takachiho International, Inc.*, 709 F.2d 1517 (9th Cir.1983), *aff'g* 220 U.S.P.Q. (BNA) 508 (C.D.Cal.1982), is to no avail. Yamaha–America asserts that the facts of *Model Rectifier* "are foursquare with the facts here with a single exception: Model Rectifier's shareholders were U.S. citizens." Reply Brief of Appellants (filed Jan. 31, 1992) at 15. *Model Rectifier,* however, involved the "classic" gray-market situation: A domestic U.S. company enters into an arms-length agreement with a foreign trademark holder to be its exclusive United States distributor; third parties buy the product abroad, import it into the United States, and undersell the domestic company. The district court granted Model Rectifier's motion for a

preliminary injunction enjoining the sale of the gray-market goods in the United States. The important distinction between Model Rectifier and Yamaha–America was not the nationality of its shareholders but the fact that it was an independent company that had bargained with the foreign trademark holder for exclusive rights to distribute the product in the United States.

**15.** "The Secretary of the Treasury shall prescribe ... rules and regulations not inconsistent with law ... and shall give such directions to customs officers and prescribe such rules and forms to observed by them as may be necessary for the proper execution of the law." 19 U.S.C. § 66 (1988).

**16.** Although it is not necessary to reach the merits of appellant's takings claim, we note that Yamaha–America has failed to cite to us a single case in which a court has recognized a takings claim when the right allegedly being deprived by governmental regulation is, itself, a right provided by statute.

dressed the scope of the Secretary's power to promulgate the Regulation. Yamaha–America's Brief at 11–12. Yamaha–America argues in its reply brief that the focus of its "exceeding authority claim here is that the Regulation is inconsistent with the Friendship Treaty and the Paris Convention which have the force of a statute and are the law of the land." Reply Brief of Appellant (filed Jan. 31, 1992) ("Reply Brief") at 7 (citation omitted). But the Regulation would exceed the Secretary's authority under the treaties only to the extent that it deprives foreign corporations of "national treatment" under United States customs and trademark laws; as we have seen, the Regulation does nothing of the kind.

To the extent that Yamaha–America's claim that the Secretary exceeded his authority in promulgating the Regulation depends on the conclusion that section 526 prohibits such an interpretation, *see* Brief of Appellant at 11–12, that issue has been definitively settled by *K Mart Corp.* Yamaha–America relies on a passing reference in *Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163 (S.D.N.Y.1984), to the effect that there exists a "substantial question" about whether Customs exceeded its authority under section 526 in promulgating the Regulation, *see* Reply Brief at 7 n. 4.[17] However, not only was this dicta, but *Osawa* was decided four years before *K Mart Corp.* If the Supreme Court's opinion in *K Mart Corp.* stands for anything, it is that the Secretary's Regulation was a permissible construction of section 526.

### III. CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.

*It is so ordered.*

---

**17.** The *Osawa* court noted that the "substantial question, which need not be decided here in view of Customs' grant of an exclusion order to plaintiff, is whether Customs exceeded its authority in promulgating the regulations in question." After quoting from section 526, the court

concluded that "[i]t contains no suggestion that the right of the U.S. markholder to receive its benefits depends on subtle variations in its relationship with the foreign markholder." *Osawa,* 589 F.Supp. at 1177.