**Sheryl L. HALL, Appellant,**

v.

**Hillary Rodham CLINTON, In her personal capacity, and DNC Services Corporation *d/b/a* Democratic National Committee, Appellees.**

**No. 01–5142.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 19, 2002.

Decided April 5, 2002.

Larry E. Klayman argued the cause for the appellant.

Michael S. Raab, Attorney, United States Department of Justice, argued the cause for appellee Hillary Rodham Clinton. Roscoe C. Howard, Jr., United States Attorney, and Mark B. Stern, Attorney, United States Department of Justice, were on brief.

Joseph E. Sandler argued the cause for appellees DNC Services Corporation and Democratic National Committee.

Before: HENDERSON, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HENDERSON.

Concurring Opinion filed by Circuit Judge RANDOLPH.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The appellant, Sheryl L. Hall, seeks reversal of the district court's March 28, 2001 opinion and order denying her motion to disqualify the Department of Justice (DOJ) from representing appellee Hillary Rodham Clinton (Clinton) and dismissing her lawsuit against Clinton and the Democratic National Committee (DNC). *See Hall v. Clinton,* 143 F.Supp.2d 1 (D.D.C. 2001) (*Hall II*). In the district court, Hall, a former White House employee, sued Clinton under common-law tort theories of tortious interference with contractual relations and intentional infliction of emotional distress. In addition, she sued the DNC, alleging that it conspired to interfere with her civil rights and that it engaged in civil conspiracy.

As to Hall's claims against Clinton, the district court held that the DOJ can represent Clinton pursuant to 28 U.S.C. § 517 because its decision to do so is either

unreviewable generally or is in this case supported by "a sufficient interest to pass muster under the flexible mandate of that statute." *Hall II*, 143 F.Supp.2d at 4. The court found that an earlier decision of the United States District Court for the Eastern District of Virginia (Eastern District) precluded it from considering either of Hall's tort claims. It went on to hold that, in any event, the Civil Service Reform Act (CSRA), 5 U.S.C. §§ 1101 *et seq.*, "provides the sole remedy for the actions by Clinton in this case." *Id.* at 5.

As to Hall's claims against the DNC, the district court, which assumed *arguendo* that the doctrine of issue preclusion did not bar her civil rights conspiracy claim, *see id.* at 6, held that the CSRA preempts that claim, *see id.* Additionally, it found that—irrespective of the CSRA—Hall's civil rights conspiracy claim would be barred by the statute of limitations. *See id.* Finally, it held that the DNC could not be liable for civil conspiracy because the alleged conspiracy "does not have as its object an objectionable wrong." *Id.* (quotation omitted).

Point by point, Hall contests on appeal each of the district court's conclusions. Because her arguments are without merit, *see infra* Part II, we affirm the district court.

## I.

Hall is a former computer systems manager of the Office of Administration in the Executive Office of the President. She alleges that in November 1993 she was directed to develop software for the "White House Office Database" (WhoDB), which she asserts was being developed for "partisan, political purposes." Joint Ap-

pendix (JA) 10 (Compl. ¶ 12).[1] Among these purposes, she alleges, were the "tracking [of] information on thousands of Clinton/DNC campaign contributors, the amounts that had been contributed and perquisites that had been doled out, such as White House coffees and overnight stays, as well as the coordination of Clinton/DNC political and fund-raising events." JA 11 (Compl. ¶ 12). Hall further alleges that she "expressed reservations about whether the project complied with the Hatch Act," 18 U.S.C. §§ 594 *et seq.*, and that she was thereafter "assigned only menial tasks and was excluded from projects in which she previously had been involved and for which she had been employed." JA 11, 13 (Compl. ¶¶ 15, 22). Hall asserts that in November 1996 her "position was eliminated and her duties and supervisory responsibilities were assigned to a lesser qualified individual under whose supervision she was assigned to work." JA 13 (Compl. ¶ 23). According to Hall, "these actions were undertaken at the direction of Mrs. Clinton and in retaliation for Hall's challenging the unlawfulness of the WhoDB, in an attempt to force Hall to terminate her employment at [t]he White House." JA 13 (Compl. ¶ 24). Hall claims that she suffered "extreme emotional distress and stress-related physical conditions" as well as "additional, substantial pecuniary losses" because of the alleged goings-on at the White House. JA 14 (Compl. ¶ 27). She ultimately resigned from her position effective September 10, 1999. *See* JA 14.

On May 17, 1999 Hall filed a *pro se* complaint in the Eastern District against Clinton and senior White House officials. She subsequently filed an amended com-

---

1. In reviewing the district court's grant of the defendants' motions to dismiss, we accept as true the allegations that Hall sets forth in her complaint. *See El–Hadad v. United Arab Emi-*

*rates,* 216 F.3d 29, 32 n. 5 (D.C.Cir.2000) (citing *Saudi Arabia v. Nelson,* 507 U.S. 349, 351, 113 S.Ct. 1471, 1474, 123 L.Ed.2d 47 (1993)).

plaint in which she claimed, *inter alia*, that Clinton had conspired with other officials to "hinder or impede [her] by intimidation or threat, in the lawful discharge of her duties, and/or to injure [her] in her person or property on account of the lawful discharge of her duties," in violation of 42 U.S.C. § 1985 (section 1985).[2] JA 116. Clinton and her co-defendants moved to dismiss and, on December 3, 1999, the Eastern District granted the defendants' motion, holding that the court lacked subject matter jurisdiction over Hall's section 1985 claim because "the actions of the defendants [were] clearly employment-related and [were] encompassed under the [preemptive] remedial scope of the CSRA." JA 127 (*Hall v. Clinton*, No. 99–694–A, mem. op. at 6 (E.D. Va. Dec. 3, 1999)). On December 19, 2000 the United States Court of Appeals for the Fourth Circuit affirmed, holding that "Congress intended that the CSRA would operate to the exclusion of all other statutory remedies for claims arising out of the federal employment relationship." *Hall v. Clinton*, 235 F.3d 202, 206 (4th Cir.2000) (*Hall I*), *cert. denied*, 532 U.S. 995, 121 S.Ct. 1656, 149 L.Ed.2d 639 (2001).

On December 13, 1999—just ten days after the dismissal of her complaint against Clinton and others—Hall initiated this suit in the district court. She brought two common-law tort claims against Clinton: a claim of tortious interference with contractual relations on the ground that "Clinton willfully and intentionally interfered with Hall's long-standing employment relationship with the United States Government in an attempt to force Hall to terminate that relationship," JA 14 (Compl. ¶ 33); and a claim of intentional infliction of emotional distress on the ground that "Clinton's conduct towards Hall ... was extreme and outrageous, not only due to the nature of the conduct itself but also because such acts and conduct constitute[d] a gross abuse of Mrs. Clinton's position as First Lady of the United States," JA 15 (Compl. ¶ 36). In addition, Hall brought two claims against the DNC: a claim that it violated section 1985 in that Clinton and the DNC "conspired to injure Hall ... on account of [her] having discharged her budgetary, managerial, supervisory and other duties," JA 17 (Compl. ¶ 44); and a claim of civil conspiracy on the ground that Clinton and the DNC "tacitly or explicitly agreed to develop the WhoDB using United States Government personnel and United States Government resources, in direct violation of the Hatch Act," JA 16 (Compl. ¶ 40). Finally, Hall filed a motion to disqualify the DOJ from representing Clinton in the litigation.

As mentioned above, the district court held that the DOJ's decision under section 517 to represent the former First Lady is not subject to judicial review or, alternatively, that section 517 expressly authorizes the decision. *See Hall II*, 143 F.Supp.2d at 3–4. Further, it dismissed all four of Hall's claims for various and alternative reasons, *see id.* at 5–6, that Hall now challenges.

---

2. 42 U.S.C. § 1985 provides, in pertinent part, that

[i]f two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; ... or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties; ... the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(1), (3).

## II.

We discuss the district court's holdings on the motions presented—and address Hall's challenges thereto—in turn.

### A.

■ Hall claims, first, that the district court erred in failing to disqualify the DOJ from representing Clinton because "Clinton was neither an officer nor an employee of the U.S. Government" at the time Hall filed her complaint. Br. of Appellant at 28. We review the court's denial of a motion to disqualify counsel for abuse of discretion, *see Wheat v. United States*, 486 U.S. 153, 163–64, 108 S.Ct. 1692, 1699–1700, 100 L.Ed.2d 140 (1988), and therefore will not lightly cast its decision aside.

■ Under 28 U.S.C. § 517,

[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to *any other interest* of the United States.

28 U.S.C. § 517 (emphasis added). The district court concluded that "a decision to provide representation subject to § 517 is non-reviewable" by a federal court because, under the United States Supreme Court's decision in *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), it is "committed to the [DOJ's] sole discretion and there [is] no law for a reviewing court to apply." *Hall II*, 143 F.Supp.2d at 4. In support of this proposition, the district court cited *Falkowski v. EEOC*, 764 F.2d 907 (D.C.Cir.1985), *reh'g*

denied, 783 F.2d 252 (D.C.Cir.), *cert. denied*, 478 U.S. 1014, 106 S.Ct. 3319, 92 L.Ed.2d 727 (1986), in which we held that the DOJ's decision *not* to provide legal representation under section 517 was unreviewable. *Falkowski*, 764 F.2d at 911 (DOJ's decision "involve[d] the allocation of [the] agency's scarce legal resources" and was therefore "better suited to the expertise of the agency than of the courts"). If we were dealing here with the DOJ's decision not to represent Clinton, *Falkowski* would settle the matter; we could not review, much less second-guess, the agency's discretionary call. *Heckler* makes clear, however, that "when an agency *does* act …, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory powers." *Heckler*, 470 U.S. at 832, 105 S.Ct. at 1656 (emphasis in original);[3] *cf.* 5 U.S.C. § 706(2)(A) ("The reviewing court *shall* … hold unlawful and set aside agency *action* … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…." (emphasis added)). Thus, although Clinton appropriately emphasizes the "lengthy history of discretionary authority enjoyed by the Attorney General in determining whether to provide [legal counsel] to federal personnel," Br. of Appellee Clinton at 32 (quotation omitted), we decline to extend *Heckler* to the DOJ's *affirmative* decision to represent her.

■ Nevertheless, we affirm the district court's denial of Hall's motion to disqualify the DOJ on a narrower ground: "[T]he government has articulated a suffi-

---

3. Acknowledging that *Heckler* suggests "a decision to act may be reviewable, even though a decision not to act is not reviewable," *Hall II*, 143 F.Supp.2d at 4, the district court held in the alternative that if the DOJ's decision to represent Clinton *is* reviewable, the decision was lawful. *See infra*.

cient interest to pass muster under the flexible mandate of" section 517. *Hall II,* 143 F.Supp.2d at 4. The statute plainly confers upon the Attorney General broad discretion in his decision to dispatch government lawyers "to attend to *any* ... interest of the United States." 28 U.S.C. § 517 (emphasis added); *see Falkowski,* 783 F.2d at 253 (footnote omitted). Indeed, as the district court pointed out, the statute would appear to permit representation of *private* individuals as long as a government interest is at stake. *Hall II,* 143 F.Supp.2d at 4 (citing *Brawer v. Horowitz,* 535 F.2d 830, 834 (3d Cir.1976) (it "approaches the frivolous" to argue that "the Department of Justice possesses no statutory or regulatory authority [under section 517] to represent a nongovernment defendant in a civil case")). Therefore, even if Clinton were a purely private citizen at all times relevant to Hall's suit—and, arguably, she was not[4]—it was well within the DOJ's discretion to determine that the United States has (and continues to have) an interest in representing the former First Lady in litigation based upon actions she allegedly undertook while at the White House. The district court did not abuse *its* discretion in so concluding.

### B.

Next, Hall asserts that the district court erroneously dismissed her common-law tort claims against Clinton. She contends that the doctrine of issue preclusion does not apply because "the Eastern District was not required to consider whether the CSRA provided the sole remedy [for] the conduct at issue, as opposed to claims at issue" and because "there is an important difference between the law of this Circuit and the law in the Fourth Circuit." Br. of Appellant at 10. She argues as well that in enacting the CSRA the Congress did not intend to preempt common-law tort claims "against non-federal employees ... such as Mrs. Clinton." *Id.* at 17. We review the district court's dismissal *de novo, see Artis v. Greenspan,* 158 F.3d 1301, 1306 (D.C.Cir.1998), and conclude that Hall's arguments for reversal do not avail her.

▮ Under the doctrine of issue preclusion, as we held in *Yamaha Corp. of Am. v. United States,* 961 F.2d 245 (D.C.Cir.1992), *cert. denied,* 506 U.S. 1078, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993), the standards for establishing the preclusive effect of an earlier holding are:

> First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case.... Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination. An example of such unfairness would be when the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude.

*Yamaha Corp.,* 961 F.2d at 254 (citations omitted). Hall believes that the doctrine

---

4. The Congress has explicitly acknowledged the First Lady's quasi-official role in White House affairs: "Assistance and services ... are authorized to be provided to the spouse of the President in connection with assistance provided by such spouse to the President in the discharge of the President's duties and responsibilities." 3 U.S.C. § 105(e). Indeed, expressly relying on this provision, we have construed the Federal Advisory Committee Act's phrase, "fulltime officers or employees of the Federal Government," 5 U.S.C.App. 2, § 3(2)(iii), to include Clinton. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,* 997 F.2d 898, 911 (D.C.Cir.1993).

is inapplicable here because, she says, the Eastern District did not need to determine whether the CSRA forecloses the common-law tort claims she raises in *Hall II* but did not "submit for judicial determination" in *Hall I*. Hall's definition of "issue," however, is far too narrow. As the district court recognized, the "issue" before the Eastern District in *Hall I* was *not* whether the CSRA preempted Hall's section 1985 claim against Clinton; rather, it was whether the CSRA "constituted the sole remedy for [Clinton's] alleged *conduct*." *Hall II*, 143 F.Supp.2d at 5 (emphasis in original); *see also Hall I*, 235 F.3d at 205. Thus, Hall's common-law tort allegations in this litigation are not new issues but simply new *legal theories*. And, as we made clear in *Yamaha Corp.*,

> [i]f a new legal theory or factual assertion put forward in the second action is related to the subject-matter and relevant to the issues that were litigated and adjudicated previously, so that it *could* have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged.

*Yamaha Corp.*, 961 F.2d at 257–58 (quotation omitted) (emphasis in original). Hall could have raised her tort claims in the Eastern District in *Hall I*. Nowhere does she assert that she lacked incentive to raise them. Because her contention that Clinton committed common-law torts against her is "relevant to the issue[ ] that

[was] litigated and adjudicated previously"—namely, whether the CSRA constituted the sole remedy for Clinton's conduct—the Eastern District's judgment in *Hall I* precluded the district court in *Hall II* from considering the tort claims.[5] The district court, therefore, correctly dismissed the claims for lack of subject matter jurisdiction.[6]

### C.

Finally, Hall asserts that the district court erroneously dismissed her section 1985 and civil conspiracy claims against the DNC. She argues: that her section 1985 claim is not time-barred by the District of Columbia's three-year statute of limitations because "she did not and could not discover crucial facts concerning the bases for her claims ... until November 30, 1998," Br. of Appellant at 10; that she "clearly states a cause of action for ... civil conspiracy" against the DNC because she "plainly alleges that Mrs. Clinton and the DNC agreed to a common, unlawful plan—to convert government resources and utilize government personnel to create a database for ... partisan political purposes," *id.* at 10–11; and that the CSRA does not preempt either of her conspiracy claims against the DNC because the DNC is not a federal entity, *see id.* at 10. Once again, we review *de novo* the district court's dismissal of Hall's claims, *see Artis*, 158 F.3d at 1306, and, once again, we find her arguments for reversal unavailing.

---

**5.** Even if it were true that the Fourth Circuit's law on CSRA preemption differs from ours, as Hall contends, *see* Br. of Appellant at 15–17, a difference in substantive law "does not affect the application of issue preclusion." *Yamaha Corp.*, 961 F.2d at 258.

**6.** The district court found it unnecessary to consider "whether Hall's claims [against Clinton] are barred by the doctrine of claim preclusion." *Hall II*, 143 F.Supp.2d at 5 n. 3. Because affirmance is justified on issue pre-

clusion grounds, we also decline to reach the claim preclusion question. Likewise, while it may be true that "Congress intended for the CSRA to be a comprehensive remedy for federal employees with individualized job grievances," *id.* at 5 (citing, *inter alia, Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983); *Spagnola v. Mathis*, 809 F.2d 16, 30 (D.C.Cir.1986)), we do not reach that issue.

■ Hall's section 1985 claim against the DNC *is* time-barred. No one disputes that "the relevant statute of limitations for a § 1985(1) violation in this jurisdiction is three years." *Hall II*, 143 F.Supp.2d at 6. The statute-of-limitations clock starts ticking when the plaintiff has sufficient "notice of the conduct ... which is now asserted as the basis for [her] lawsuit." *Fitzgerald v. Seamans*, 553 F.2d 220, 228–29 (D.C.Cir. 1977). The last act that allegedly caused Hall damage occurred in November 1996, when "Hall's position was eliminated and her duties and supervisory responsibilities were assigned to a lesser qualified individual under whose supervision she was assigned to work." JA 13 (Compl. ¶ 23). Because Hall did not file her complaint until December 13, 1999—outside the three-year window—the statute of limitations bars her section 1985 claim.

Hall resists this conclusion, pointing to an allegation in her complaint that she "did not discover the operative facts alleged [t]herein until after the publication on or about November 30, 1998 of a report by the United States House of Representatives Committee on Government Reform and Oversight [about] the WhoDB." JA 14 (Compl. ¶ 28). In light of this allegation, she says, we must assume to be true—for motion-to-dismiss purposes—that the statute-of-limitations clock did not start until November 30, 1998. *See* Br. of Appellant at 21–22 (citing *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994)). Hall's argument is misguided. Indeed, the very case she cites for her proposition makes clear that we need not defer to her legal "allegations" about the statute of limitations any more than we would have to accept as true an "allegation" asserting, for instance, that

"existing precedent requires the court to award me the damages I seek." *See Kowal*, 16 F.3d at 1276 ("[T]he court need not accept ... legal conclusions cast in the form of factual allegations." (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 2944–45, 92 L.Ed.2d 209 (1986))). The complaint itself reveals that Hall knew in November 1993 that the WhoDB was allegedly "to be used to further the private, political interest of the Clintons and the DNC." JA 11 (Compl. ¶ 12); *see Hall II*, 143 F.Supp.2d at 6. The district court, therefore, properly dismissed her section 1985 claim against the DNC.[7]

■ It is equally clear that Hall has not stated a cause of action against the DNC for civil conspiracy. Civil conspiracy, of course, is not actionable in and of itself but serves instead "as a device through which vicarious liability for the underlying wrong may be imposed upon all who are a party to it, where the requisite agreement exists among them." *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1493 (D.C.Cir.1989). The district court quoted our case law, quite rightly, for the proposition that "'as a matter of substantive law, one cannot be liable for a conspiracy that does not have as its object an *actionable* wrong.'" *Hall II*, 143 F.Supp.2d at 6 (quoting *Riddell*, 866 F.2d at 1494) (emphasis added). Hall contends that, for the purpose of civil conspiracy, it does not matter whether the predicate conduct is independently actionable or merely illegal; in both instances, she asserts, an action lies for conspiracy. *See* Reply Br. of Appellant at 7. Yet again, the very case Hall cites, *Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir.1983), refutes her assertion in no uncertain terms. *Halberstam* holds that the two essential elements of civil conspir-

---

7. Because we affirm the district court's dismissal of Hall's section 1985 claim on statute-of-limitations grounds, we need not address whether the CSRA preempts that claim. *Cf. supra* note 6.

acy are (1) "an agreement to take part in an unlawful action or a lawful action in an unlawful manner"; *and* (2) "an overt *tortious* act in furtherance of the agreement that causes injury." *Id.* at 479 (emphasis added). The hornbook definition of a "tort" is "[a] civil wrong *for which a remedy may be obtained.*" BLACK'S LAW DICTIONARY 1496 (7th ed.1999) (emphasis added). With regard to the civil conspiracy claim against the DNC, Hall's complaint alleges only that Clinton and the DNC "tacitly or explicitly agreed to develop the WhoDB using United States Government personnel and United States Government resources, in direct violation of the Hatch Act." JA 16 (Compl. ¶ 40). "Violation of the Hatch Act," however, is not a tort.[8] Thus, because the Act does not make a violation thereof privately actionable, *see Brooks v. Nacrelli,* 331 F.Supp. 1350, 1354 (E.D.Pa. 1971) (Hatch Act's provisions enforced exclusively by government), *aff'd,* 473 F.2d 955 (3d Cir.1973), a *conspiracy* to violate the Act is not actionable either.[9]

### III.

For the foregoing reasons, the district court's denial of Hall's motion to disqualify the DOJ and its dismissal of her claims against Clinton and the DNC are

*Affirmed.*

RANDOLPH, *Circuit Judge,* concurring: If the government had raised a separation of powers argument in support of its claim that the Justice Department's decision to represent now-Senator Clinton is nonreviewable, I might have been persuaded to reach a different conclusion in this case. *See* U.S. CONST., art. II, § 3. Several cases, perhaps dating as far back as *Hayburn's Case,* 2 U.S. 408, 2 Dall. 409, 1 L.Ed. 436 (1792), have reviewed the Attorney General's decision to undertake legal representation in pending cases. *But see* Maeva Marcus, Hayburn's Case: *A Misinterpretation of Precedent,* 1988 WIS. L. REV. 527, 535 (concluding that the real issue in *Hayburn's Case* was whether Attorney General Randolph had the power to proceed without specific authorization from the President). But none of these cases expressly addresses whether the separation of powers inherent in the Constitution precluded the courts from questioning the judgment of the Executive Branch on such a matter. *See, e.g., Booth v. Fletcher,* 101 F.2d 676, 681–82 (D.C.Cir.1938); *Meredith v. Van Oosterhout,* 286 F.2d 216, 220 (8th Cir.1960); *Int'l Prods. Corp. v. Koons,* 325 F.2d 403, 408 (2d Cir.1963); *Brawer v. Horowitz,* 535 F.2d 830, 834–35 (3d Cir. 1976). The issue therefore remains open. *See Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925).

---

**8.** Perhaps realizing that the district court applied *Riddell* and *Halberstam* correctly, Hall asserts for the first time on appeal that the underlying torts were actually Clinton's alleged intentional interference with contractual relations and intentional infliction of emotional distress. *See* Br. of Appellant at 28. We are precluded from considering her assertion because she did not raise it below. *See District of Columbia v. Air Fla., Inc.,* 750 F.2d 1077, 1084 (D.C.Cir.1984).

**9.** Because the district court properly dismissed Hall's civil conspiracy claim on this ground, we need not inquire whether the CSRA preempts the claim. *Cf. supra* notes 6–7. Moreover, although the civil conspiracy claim is governed by the same three-year statute of limitations as the section 1985 claim, *see* D.C.Code § 12–301(8)—and might well have been barred on that ground—the district court did not consider the prospect because the parties did not raise it. Likewise, we need not consider whether Hall's civil conspiracy claim is time-barred.

TOWN OF STRATFORD,
CONNECTICUT,
Petitioner,

v.

FEDERAL AVIATION ADMINISTRA-
TION and Jane F. Garvey, Admin-
istrator, Respondents.

No. 99–1507.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 6, 2000.

Decided April 9, 2002.

William A. Butler argued the cause and filed the briefs for petitioner.

Robert H. Oakley, Attorney, United States Department of Justice, argued the cause for respondents. With him on the brief were Lois J. Schiffer, Assistant Attorney General, and Ellen Durkee, Attorney.

Before: ROGERS and GARLAND, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge SILBERMAN.

SILBERMAN, Senior Circuit Judge:

The Town of Stratford petitions for review of the Federal Aviation Administration's Decision concerning the Bridgeport–Sikorsky Memorial Airport and disposal of land from the Stratford Army Engine Plant. We conclude that Stratford lacks prudential standing to pursue its claims that the FAA's Environmental Impact Statement (EIS) was inadequate under the National Environmental Policy Act[1] and that its remaining claims are without merit. Stratford's petition is therefore denied.

## I.

The Bridgeport–Sikorsky Memorial Airport (BDR) belongs to Bridgeport, Connecticut, but actually sits in the neighboring town of Stratford. The airport is bounded by wetlands and the Stewart B. McKinney National Wildlife Refuge, Great Meadows Marsh to the southwest, by the Lordship township to the south and east, by Connecticut State Highway 113 (Stratford's "Main Street") to the northeast, and by the residential township to the northwest. Across Main Street from the airport is the Stratford Army Engine Plant (SAEP), which has closed. Stratford and Bridgeport have had a number of disputes over the airport, some of which focused on the property tax revenues Stratford loses because of the airport's municipal status. In 1978, the disputes resulted in a court-approved settlement that required Bridgeport to obtain Stratford's permission for "the acquisition of land for the purposes of extension of the airport runways, and . . . for the extension of any of the airport runways." The airport has two runways

currently in use: Runway 6–24, which is the primary one, and Runway 11–29.[2]

Bridgeport has filed an "Airport Master Plan" with the FAA that calls for the renovation of the two runways, beginning with Runway 6–24, and the addition of several safety enhancements. Bridgeport asserts that the concrete on Runway 6–24 needs replacement to make the airport safer. Replacing the concrete is a "reconstruction . . . of a runway," which requires the city to construct "a [runway] safety area that conforms to the dimensions acceptable to the [FAA]" at the time of reconstruction. 14 C.F.R. 139.309(a)(2).

The length of a runway safety area is determined by an airport's "design classification," a description of the largest class of aircraft that uses the runway for 500 or more operations per year. The category is determined by the design aircraft's landing-approach speed and the group by the design aircraft's wingspan. The recommended safety area for a C–II airport is 1000 feet long by 500 feet wide at either end of the runway. (By contrast, a B–II airport has a recommended safety area of only 600 feet by 300 feet.) BDR is currently a C–II airport, the safety areas for which would require expansion of the airport (although not the runways themselves) into the space currently occupied by Main Street and beyond.

After receiving Bridgeport's Airport Plan, the FAA prepared an EIS evaluating various possible safety measures at the airport. The EIS' Statement of Purpose and Need outlined its general objective of increasing safety for general/corporate and commercial aviation services. The EIS

---

**1.** 42 U.S.C. §§ 4321–4370e. Stratford also invokes two sets of NEPA implementing regulations—those of the Council on Environmental Quality, 40 C.F.R. § 1500–17, and the Airport Environmental Handbook, FAA Order 5050.4A for implementation of NEPA.

**2.** Runways are named for their headings, to the nearest 10°. Runway 6–24 runs 60° and 240°, depending on which way a plane comes in. Runway 11–29 runs 110° and 290°.

considered three groups of alternatives. The Preferred Alternative shifted runway 6–24 to the northeast, provided for a new taxiway area (which encroaches on the SAEP), provided for safety areas of 1000 feet on either end of the runway, placed a light system on a catwalk through wetlands, required the rerouting of Main Street through the SAEP, recommended annexation of four SAEP acres and placing "avigation restrictions covering height and electromagnetic, smoke, and light emissions," on an additional five,[3] and created wetland impacts which would require mitigation. Importantly, the Preferred Alternative did not contemplate extending the runway itself.

The FAA then issued its Decision, which followed the EIS, approving in most part the Airport Master Plan, including expanded safety areas. Stratford petitions for review of that Decision on three grounds: first, that the FAA's Environmental Impact Statement was inadequate under NEPA, the CEQ regulations and Airport Handbook; second, the FAA violated the Airports and Airways Improvement Act;[4] and third, subsequent events require preparation of a Supplemental EIS.

While the FAA was considering the Airport Master Plan, the SAEP was scheduled for closure under the Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101–510 (1990), and the recommendations of the 1995 Defense Base Closure and Realignment Commission (collectively "BRAC"), and the Army was considering how to dispose of that land. BRAC sets forth the federal policy preference of returning the land of closing bases to the host community—in this case, Stratford.

As part of the base closure process, the Army also prepared an EIS. Its Preferred Alternative was the "Encumbered Disposal Alternative," which would transfer the SAEP land to Stratford subject to restrictions preventing redevelopment of the property from interfering with BDR and from producing excessive wetland or other environmental impacts. In its EIS, the Army discussed the economic effects of the proposed safety enhancements as well as the potential conflict between protecting BDR's operations and Stratford's redevelopment plans. The Army ultimately concluded that its Preferred Alternative would not be expected to cause "any serious disruption or impairment to redevelopment of the site," in part because the encumbered parcel was at the fringe of the SAEP in the area most prone to airport noise, which made it the least desirable parcel for development. As for moving Main Street, the Army concluded that it would entail minor long term adverse impacts but would also produce minor beneficial effects on air quality. The Army issued two decisions concerning disposal of the disputed land, one in January 2001, the other in November 2001. The FAA now purports to rely on the Army's consideration of certain factors.

At oral argument, we sua sponte raised the question of whether Stratford had been injured so that standing existed, and whether the case was ripe for decision. We had two primary concerns: first, the Army had not yet issued its decision concerning disposal of the SAEP land. Second, Stratford claimed that it exercised veto power over a potential movement of Main Street, which called into question the

---

**3.** These avigation restrictions create an imaginary geometric plane above which structures cannot be built for fear of interfering with aircraft in flight. This plane begins at the edge of the airport and moves gradually up-

ward, since the farther from the airport the less the chance a low-flying plane would collide with a building.

**4.** 49 U.S.C. §§ 47101 *et seq.*

likelihood of the FAA's Preferred Alternative ever being implemented. After the Army issued its decision, the parties submitted supplemental briefing concerning standing and ripeness. The FAA told us "that the Administrator ... has concluded that the FAA will seek to condemn the road so that the airport enhancements needed for safety reasons can be constructed at BDR." Stratford, therefore, will no longer be able to exercise veto power over a movement of Main Street. With the issuance of the Army's decision and FAA counsel's representation as to condemnation, Stratford's petition is ripe for review.[5] We are also satisfied that Stratford meets the requirements for Article III standing because its developmental prospects are clearly impaired.

## II.

◼ Although we conclude that Stratford has suffered an injury-in-fact, there still remains the question whether it has prudential standing to raise its NEPA, CEQ, and Airport Handbook claims. Stratford does assert that relocating Main Street will add almost a minute of travel time to automobile users of Main Street—including its emergency personnel—but the Town does not claim that it (or anyone else) will suffer any environmental injury because of that delay. Nor does Stratford claim that its other injury-in-fact—that but for the FAA's decision nine additional acres would be available for development—has any negative environmental consequences.

Since NEPA does not create a private right of action, petitioner relies on the APA, which limits prudential standing to an "aggrieved party" within the meaning of the substantive statute upon which the claim is based. 5 U.S.C. § 702; *see also Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). But we have squarely held that a NEPA claim may not be raised by a party with no claimed or apparent environmental interest. *See, e.g., ANR Pipeline Co. v. FERC,* 205 F.3d 403, 408 (D.C.Cir.2000). It cannot be used as a handy stick by a party with no interest in protecting against an environmental injury to attack a defendant.

To be sure, the Supreme Court in *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), in reversing the Ninth Circuit, not surprisingly recognized that the Endangered Species Act did allow a petitioner with only economic interests to challenge an action of the Fish and Wildlife Service. That was because the specific section of the statute upon which the petitioners (irrigation districts and ranchers) relied was drafted at least in part to avoid needless economic dislocation. The Court emphasized that a court must examine—not just the general aims of a statute—but the specific provision in question to determine whether a plaintiff or petitioner has prudential standing.

◼ Although petitioner in our case does not even suggest a real basis for prudential standing, the government points us to an Eighth Circuit case, *Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115 (8th Cir. 1999), reasoning that a CEQ regulation implementing NEPA can confer prudential standing on a petitioner asserting an economic injury even if the statute does not.

---

**5.** Although the City of Bridgeport must still obtain certain permits in order for the airport redevelopment to progress, the Decision itself is ripe for review even if the sponsor has yet to get all of the permits required for construction. *See City of Bridgeton v. FAA,* 212 F.3d 448, 463 n. 6 (8th Cir.2000).

The regulation provides that "human environment" as used in the statute "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. And the regulation further states that:

> This means that economic and social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

*Id.* The Eighth Circuit read the *Bennett* reference to "the particular provision of law upon which the plaintiff relies" to include a provision of an implementing regulation—even though the Supreme Court quite clearly in *Bennett* was referring to a particular section of a statute.

We do not see how any agency regulation implementing a statute could extend prudential standing beyond the class of persons Congress intends, but, in any event, we do not read the CEQ regulation as purporting to extend prudential standing. It does indicate that when economic and social effects are interrelated with natural and physical environmental effects the EIS will "discuss" all of these effects, but it does not require government agencies to take economic effects into account. Moreover, the Town of Stratford is not even claiming, as did the ranchers in *Bennett*,

that the government's actions calculated to protect the environment directly harm its economic interests, nor does it claim that those interests are in any other manner interrelated with the environmental effects. Instead, petitioner's assertion that the FAA's EIS is defective because not sufficiently sensitive to environmental concerns is truly unrelated—or at most "marginally related"—to the injury it asserts, except insofar as it argues that the entire Airport Plan should not go forward. *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). In other words, petitioner has not connected its claimed economic injury to any environmental effects caused by the allegedly defective EIS. Instead, its EIS claim is simply the "handy stick" with which to attack the FAA.[6]

### III.

■ In its remaining set of challenges, Stratford argues that the FAA failed to comply with the Airports & Airways Improvement Act (AAIA) in various ways. It is claimed that the Decision does not comply with 49 U.S.C. § 47106(a)(1), which provides that a grant may be given to finance airport projects only if the Secretary is satisfied that "the project is consistent with plans (existing at the time the project is approved) of public agencies authorized by the State in which the airport is located to plan for the development of the area surrounding the airport." The FAA responds that it is not clear that Stratford is a "public agency" with plan-

---

**6.** Stratford brings several other claims under an additional CEQ regulation and several provisions of the FAA's Airport Environmental Handbook, each of which implement NEPA. These include the Town's claims that the FAA's decision is arbitrary because it fails to consider cumulative effects, alternative safety measures, and potential conflicts with federal, state, and local land use policies, among them BRAC and the settlement between Stratford and Bridgeport. Since Stratford does not have prudential standing under 40 C.F.R. 1508.14, it follows that it does not have prudential standing under the other CEQ regulation or Airport Handbook provisions either. Nor does Stratford have prudential standing to request preparation of a Supplemental EIS based on intervening events.

ning authority as that term is used in the statute. And the record indicates that BDR has yet to apply for federal funding, making it unlikely that this provision has been triggered. In any event, Stratford has not shown that the Decision is not "reasonably consistent" with its planned redevelopment. *See Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186 (7th Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986). According to "Stratford Visions: 2001—The Town's Plan of Development," Stratford seeks to "[e]ncourage land use management strategies which recognize the airport as a legitimate use at its current location [and d]iscourage placement of structures and objects in the vicinity of the airport, which would create hazards to air traffic and/or create risks to property and life." Because the FAA conditioned the proposed safety enhancement on Bridgeport obtaining the necessary federal, state, and local permits, the permitting process will ensure that the Airport Plan is consistent with local planning.

■ Stratford also asserts that the FAA failed to comply with 49 U.S.C. § 47106(b), which provides that before the FAA approves a grant for airport development, the Secretary of Transportation must be satisfied that "the sponsor, a public agency, or the Government holds good title to the areas of the airport used or intended to be used ... or that good title will be acquired." As noted above, the record does not indicate that Bridgeport has applied for funding yet. Moreover, counsel for FAA has represented to us that the agency will exercise its condemnation power to eliminate any issues over title to the land under Main Street. Stratford's claim that the FAA failed to comply with 49 U.S.C. § 47106(b)(2), which requires that the Secretary be satisfied that the "interests of the community in or near which the project may be located have

been given fair consideration" is also without merit. The record reflects Stratford's self-described "extensive" involvement in the decisionmaking process.

■ Stratford's remaining two AAIA claims are based on 49 U.S.C. § 47106(c), which applies to "an airport development project involving the location of an airport or runway or a major runway extension." Under that section, the Secretary must obtain a certification from the Governor of Connecticut that the project will meet applicable air and water quality standards, and if the Plan is found to have a significant adverse effect on natural resources, the Secretary must also determine that "no possible and prudent alternative to the project exists and that every reasonable step has been taken to minimize the adverse effect." The government maintains that the section only applies to the location of a new runway, or a major expansion of an existing runway, and the Airport Plan does not contemplate either.

Stratford argues that the shifting of the runway 700 feet to the northeast, while maintaining the same compass headings, is a "location of [a] runway." We are not persuaded by Stratford's argument that the term "location" must include any relocation—no matter how minor. It seems apparent to us that the statutory term "location" is ambiguous. That being so, the only question for us is whether, under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the FAA's interpretation is based on a reasonable construction, and we think that it is.

■ In the alternative, the Town argues that the renovation must be a "major" runway extension. The FAA has keyed the definition of "major" to noise impacts, defining a major runway expansion as one that will permit the accommodation of aircraft that would result in an increase in

noise of three decibels, an interpretation the Seventh Circuit concluded was reasonable in *Suburban O'Hare Commission,* 787 F.2d at 199–200. As the Secretary points out, Stratford's suggestion, that even if the renovation was not a "major" runway extension it was a runway location, would lead to the odd result that a runway extension, no matter what length, would not trigger AAIA's requirement unless it resulted in a significant increase in noise, yet any partial relocation, no matter how minor, would trigger section (c). But both new runways and major runway extensions potentially allow more aircraft and expo-

sure of the surrounding areas to additional noise. Because the Airport Plan does not contemplate either a "location of a runway" or a "major runway extension," section (c) does not apply, and Stratford's argument founders on a threshold reef.

Accordingly, Stratford's petition for review is denied.

UNITED STATES of America,
Appellee,

v.

Aldrin DIAZ, Defendant, Appellant.

No. 01–1446.

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 2002.
Decided March 26, 2002.

Eileen F. Shapiro, by Appointment of the Court, for appellant.

Donald C. Lockhart, Assistant U.S. Attorney, with whom Stephanie S. Browne, Assistant U.S. Attorney, and Margaret E. Curran, United States Attorney, were on brief, for appellee.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and LIPEZ, Circuit Judge.

COFFIN, Senior Circuit Judge.

Appellant Aldrin Diaz seeks reversal of his conviction for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He asserts that the district court committed plain error by placing the burden on him to prove his defense of justification. He alternatively challenges the district court's decision to depart upward from the Sentencing Guidelines. We find no plain error in the instruction, but detect flaws in the sentencing that require reconsideration of the departure. We therefore affirm the conviction, vacate the term of imprisonment, and remand for re-sentencing.

## I. *Factual Background*

Although certain particulars of the episode underlying this appeal are disputed, the differences are largely irrelevant to the issues before us. The essential facts, as the jury could have found them, are as follows. In the early morning hours of January 28, 2000, appellant and his girlfriend, Christa Calder, dropped off two friends at a fast-food restaurant in Providence, Rhode Island, so they could use the restroom. When appellant and Calder drove back to the restaurant a few minutes later, they found the two women, Brenda Ruiz and Jenny Vazquez, involved in a dispute with two other women in the restaurant's vestibule. Appellant stepped from the car and placed himself between the two pairs of women. Ruiz reached around him and struck one of the other women, Stephanie Zoglio, in the face. Ruiz held a broken glass and also may have possessed a pen with a concealed knife inside it. Zoglio may have possessed a box cutter, although appellant testified that he never saw it.

Unsuccessful in his efforts to separate the combatants, appellant moved back toward Calder's car. Shortly thereafter, someone—perhaps the fourth woman, Diana Villafane—threw two objects that hit the car's hood.[1] At that point, appellant walked over to Villafane and shoved her, causing her to fall backward. A friend of Villafane's, Wayne Pemberton, responded by rushing at appellant. During the ensuing struggle, Pemberton pushed appellant onto the hood of Calder's car and fell onto the hood himself. Appellant rolled onto the ground and yelled to Calder for her gun. Calder retrieved the loaded gun

---

1. The objects apparently were a bottle and a barbell.

from the car's glove compartment and handed it to him. Appellant waved the gun at the crowd that had gathered, yelling several times "you better run." Pemberton slipped behind a nearby truck, while making motions suggesting that he, too, was reaching for a weapon, although he did not have one. Calder testified that the scene was chaotic, the noise level was loud, and both Ruiz and Vazquez had blood on them.

Appellant, Calder, and their two friends got back into the car, with appellant at the wheel while holding the gun.[2] Before he could drive off, uniformed Providence police officers arrived and directed appellant to drop the gun. He tossed it onto Calder's lap, complied with the officers' instructions to get on the ground, and began crawling toward the police. At about the same time, Cornell Young, an off-duty police officer in plain clothes, emerged from the restaurant with his gun drawn. The uniformed officers—apparently not recognizing Young as a fellow officer—also ordered him to drop his weapon. He was fatally shot when he failed to comply.

The gun wielded by appellant was purchased by Calder in Gray, Maine, in November 1999. She testified that appellant had pointed the gun at her during an argument in their apartment on January 26, 2000—two days before the restaurant incident—and also had taken the gun to his mother's house on or about January 7.

At trial, appellant sought to justify his use of the weapon during the fracas at the restaurant as an attempt to break up the escalating fight. He testified that he felt surrounded, dazed from having been punched in the face, and in fear for his life because he thought he saw Pemberton reaching for a gun. The district court charged the jury that appellant had asserted a defense of justification and that he was obliged to prove the defense by a fair preponderance of the evidence. When discussing the issue at the charging conference, the judge specifically referred to conflicting precedent on whether the defendant or government bore the burden of proof on the justification defense, concluding that circuit and Supreme Court precedent required that affirmative defenses be proven by the defendant. Neither the government nor defense counsel objected to the instruction, either at the charging conference or after the actual charge was given to the jury.

Appellant was sentenced to the statutory maximum of 120 months in prison. The district court relied on three separate guidelines provisions for a four-level departure in the base offense level, which represented an increase of at least thirty-three months in appellant's sentence.

On appeal, appellant first claims that the district court erred in placing the burden on him to prove justification. He acknowledges that, having failed to object at trial to the instruction, he must demonstrate that the error was plain. If he fails to meet this standard, he seeks review of his sentence, asserting that the district court had no legitimate basis to depart upward from the guidelines. We address these issues in sequence.

## II. *Justification and the Burden of Proof*

■ Appellant's effort to set aside his conviction based on the district court's justification instruction is severely hampered by his failure to interpose a contemporaneous objection. To vault the high hurdle

2. Appellant testified that he had cocked the gun after he saw Pemberton reach for a weapon.

imposed by the plain error standard, appellant must demonstrate that an error occurred and that it was clear or obvious. *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Paniagua–Ramos,* 251 F.3d 242, 246 (1st Cir.2001).[3] To obtain relief from his conviction, therefore, appellant must show not only that the justification instruction was incorrect but also that it was obviously so. The state of the law forecloses such a conclusion.

 Three circuit courts have explicitly considered whether the prosecution or defense bears the burden of proof on a justification defense to a felon-in-possession charge, and they have reached different conclusions. *See United States v. Dodd,* 225 F.3d 340, 350 (3d Cir.2000); *United States v. Deleveaux,* 205 F.3d 1292, 1300 (11th Cir.2000); *United States v. Talbott,* 78 F.3d 1183, 1186 (7th Cir.1996) (per curiam). The Third and Eleventh Circuits held that the defendant must prove the defense by a preponderance of the evidence, while the Seventh Circuit ruled that the government must negate the defense beyond a reasonable doubt. If a circuit conflict exists on a question, and the law is unsettled in the circuit in which the appeal was taken, any error cannot be plain or obvious. *United States v. Gerrow,* 232 F.3d 831, 835 (11th Cir.2000); *see United States v. Gilberg,* 75 F.3d 15, 21–22 (1st Cir.1996).

Appellant asserts that this sudden-death principle is inapplicable here because First Circuit law is settled in his favor. He invokes two decisions that involved a defense of duress to drug charges, *United States v. Arthurs,* 73 F.3d 444, 448 (1st Cir.1996), and *United States v. Amparo,* 961 F.2d 288, 291 (1st Cir.1992). We held in *Amparo* that if the defendant produces sufficient evidence to warrant a duress instruction, the government must prove beyond a reasonable doubt that the defendant's criminal acts were not in fact the product of duress. *See* 961 F.2d at 291. The same result was reached in *Arthurs,* in reliance on *Amparo. See* 73 F.3d at 448. Appellant cites, in addition, the First Circuit's pattern jury instructions, which state that the government has the burden of disproving the defenses of self-defense and duress once they have been properly raised. *First Circuit Pattern Criminal Jury Instructions* §§ 5.04 and 5.05 (1998) ("First Circuit Instructions").

 While these First Circuit authorities seem facially apropos to appellant's position, closer scrutiny reveals their shortcomings. The court in *Amparo* explicitly limited its holding on the government's burden of disproving duress to those cases in which "the charged crime requires *mens rea,*" 961 F.2d at 291. In both *Amparo* and *Arthurs,* the defendants were charged, *inter alia,* with "knowingly or intentionally" possessing cocaine with the intent to distribute it. The pattern jury instructions reflect a similar limitation; although some portions of the instructions express a broader proposition,[4] the Comment to the provision on "Duress," § 5.05, echoes the *Amparo* qualification

---

**3.** The four-part test also requires a showing that the error affected substantial rights and "so seriously impaired the fairness, integrity, or public reputation of the proceedings as to threaten a miscarriage of justice." *Paniagua–Ramos,* 251 F.3d at 246.

**4.** For example, the Introductory Comment on the section covering defenses states:

> Except for the insanity defense, the defendant need only meet a burden of production, in which event the burden of persuasion is on the prosecution to negate the defense beyond a reasonable doubt.

First Circuit Instructions § 5, intro. cmt.

that "[t]he burden of persuasion remains with the government, at least if the charged crime requires *mens rea*." This allocation of the burden is logical in light of the government's obligation to prove all elements of a crime, including the specified criminal intent.[5]

Whether *Amparo*'s articulation of the burden extends to a case in which the only charge is possession of a firearm by a felon—a strictly worded crime without a specific *mens rea*—is at least debatable in light of its qualifying language. Indeed, were we to reach the merits, we think it problematic whether *Amparo*'s holding would survive in this different context. We particularly note the thoughtful analyses of the Third and Eleventh circuits, which led those courts to conclude that the burden to prove justification constitutionally and pragmatically is properly placed on the defendant in a felon-in-possession case. *See Dodd*, 225 F.3d at 343–350; *Deleveaux*, 205 F.3d at 1298–1301.[6] It strikes us as good sense to examine both the particular crime and the particular defense at issue in assigning the burden of proof. *See Dodd*, 225 F.3d at 349 (noting the "diversity of analytical solutions that the appellate courts have reached with respect to various affirmative defenses," and rejecting the argument that consistency required the court to follow entrapment

precedents that place the burden on the government).

We need delve no further into the merits of the issue. What we have said thus far suffices to show that the law is unsettled, both within and outside the First Circuit, and appellant is therefore unable to meet the plain error standard. Even if it were error to place the burden of proving justification on appellant—a proposition we doubt—any such error was not plain. Consequently, we affirm the judgment of conviction.

### III. *Sentencing Departures*

The district court invoked three provisions of the Sentencing Guidelines to increase appellant's sentence from the term specified for his base offense level and criminal history category—a range of 70 to 87 months [7]—to the statutory maximum of 120 months. This represented an upward departure of four levels. We review de novo whether the district court utilized a proper basis for departure, *United States v. Chapman*, 241 F.3d 57, 63 (1st Cir.2001), but apply the clear error standard to the court's determination that the circumstances "warrant[ed] the departure in the case at hand," *id.* The extent of the departure will be upheld as reasonable unless it reflects a manifest abuse of dis-

**5.** Indeed, the Due Process Clause of the Fourteenth Amendment requires the government to disprove beyond a reasonable doubt any defenses that negate an element of the charged offense. *See Patterson v. New York*, 432 U.S. 197, 210, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

**6.** Both courts initially noted that there was no constitutional bar to placing the burden on the defendant. *See Dodd*, 225 F.3d at 344; *Deleveaux*, 205 F.3d at 1298–99. Both also pointed to Congress's intent to broadly prohibit possession of firearms by convicted felons, *see Dodd*, 225 F.3d at 350; *Deleveaux*, 205 F.3d at 1300, and they recognized that

the defendant "will usually be best-situated to produce evidence relating to each element of this affirmative defense," *Deleveaux*, 205 F.3d at 1300 (quoted in *Dodd*, 225 F.3d at 347, 350). The Third Circuit further observed that placing the burden on the defendant was consistent with the common law, which placed the burden on the defendant to prove all affirmative defenses. *See Dodd*, 225 F.3d at 348.

**7.** This calculation included a separate two-level enhancement for obstruction of justice, bringing appellant's base offense level to 20.

cretion. *United States v. Amirault*, 224 F.3d 9, 14 (1st Cir.2000).

As we discuss below, the district court's erroneous reliance on one basis for departure, combined with lack of advance notice of its use of a second departure provision and the uncertain sufficiency of the third provision as the sole basis for the departure, requires that the case be remanded for re-sentencing. We explain our conclusion by addressing each of the three relevant provisions of the guidelines.

A. *The Departure under U.S.S.G. § 4A1.3, p.s.*

■ This provision allows a district court to depart from the otherwise applicable sentencing range "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes...." Appellant's criminal history score of 19 gave him six points more than the threshold for Criminal History Category VI, the highest category in the guidelines. In such a case, a court seeking to impose a sentence appropriate for the defendant's record may depart from the guideline range by moving down the sentencing table to a higher offense level. U.S.S.G § 4A1.3, p.s.; *see Chapman*, 241 F.3d at 63. In other words, when the criminal history category cannot be adjusted upward to account for a defendant's score because he already is in the top category, a court "may instead adjust upward the offense level in order to arrive at an appropriate sentence." *Chapman*, 241 F.3d at 63. Based on this provision, the district court moved two levels from offense level 20 to offense level 22, which provided a sentencing range of 84 to 105 months, an increase of eighteen months at the maximum end of the range.

■ Appellant challenges this departure on two fronts. First, he contends that his criminal history was not sufficiently "egregious" to trigger § 4A1.3. *See* U.S.S.G. § 4A1.3, p.s. (allowing departure in the case of "an egregious, serious criminal record"). Second, he argues that he is entitled to a remand because he received no notice that the district court intended to depart on this basis—which, as acknowledged by the government, was a violation of U.S.S.G. § 6A1.3(a), p.s. and Fed. R.Crim.P. 32(c)(1). *See Burns v. United States*, 501 U.S. 129, 138–39, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991); *United States v. Martin*, 221 F.3d 52, 55–56 (1st Cir.2000). He asserts that the omission was not harmless, as the lack of notice deprived him of the opportunity to fully demonstrate why this departure was unwarranted. He further argues that the record fails to show that the court would have imposed a four-level upward departure even if § 4A1.3 were not considered.

■ We need not evaluate the egregiousness of appellant's record because we find his notice argument to be dispositive. The court departed a total of four levels based on three provisions. Two levels were attributed explicitly to § 4A1.3—the basis for which appellant received no notice. The other departures were not assigned any particular increase; the court simply moved up to the statutory maximum in reliance on the two additional provisions. To find harmless error, as indeed the government argues, we would have to conclude that the court inevitably would have departed upward by four levels based solely on those two other factors. *See Williams v. United States*, 503 U.S. 193, 204, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992) ("[A] remand is appropriate unless the reviewing court concludes, on the record as a whole ... that the error did not affect the district court's selection of the sentence